## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO.** |
| **Jon Allan Sisco,** | § | **04-30608** |
| **DEBTOR** | § | |
| **Eric Yollick, Dependent Administrator of the Estate of Herbert Clinton Sisco,** | § | **ADV. NO.** |
| | § | **04-3252** |
| **PLAINTIFF** | § | |
| **v.** | § | |
| **Jon Allan Sisco,** | § | |
| **DEFENDANT** | § | |
| | § | |

## MEMORANDUM OPINION REGARDING THE MOTION OF ERIC YOLLICK, DEPENDENT ADMINISTRATOR OF THE ESTATE OF HERBERT CLINTON SISCO, TO DISQUALIFY THE UNDERSIGNED JUDGE FOR BIAS OR PREJUDICE AND FOR LACK OF IMPARTIALITY PURSUANT TO 28 U.S.C. § 455 IN THE FORM OF AFFIDAVIT

On December 19, 2005, after a multi-day trial in the above referenced adversary proceeding, Eric Yollick (Yollick), the Plaintiff and Counter-defendant, filed a Motion to Disqualify the Undersigned Judge for Bias and Prejudice and for Lack of Impartiality Pursuant to 28 U.S.C. § 455 in the Form of Affidavit (the Motion to Disqualify) (Docket No. 276). The Motion to Disqualify seeks to disqualify this Court from issuing orders on: (1) the Adversary Proceeding; (2) this Court's Order requiring the Plaintiff (Eric Yollick) to Show Cause Why He Should Not Be Sanctioned For Lack Of Candor (Docket No. 259); and (3) the Debtor's Second Motion to Vacate Order on Motion for Relief from Stay (Case Docket No. 116).[1] This Memorandum Opinion discusses why this Court

---

[1] Yollick initially filed the Motion to Disqualify on December 19, 2005 in the above-referenced adversary proceeding. Subsequently, he filed the same motion in the case after the Debtor filed his Second Motion to Vacate the Automatic Stay (Case, Docket No. 116). Yollick's Motion to Disqualify in the case

will deny the Motion to Disqualify.

## I. BRIEF BACKGROUND

This adversary proceeding is an extremely acrimonious dispute between Jon Allan Sisco (the Debtor) and Yollick, who is the Dependent Administrator of the Estate of Herbert Clinton Sisco. The Debtor is the son of Herbert Clinton Sisco, who died in 1993. In March of 2002, the Montgomery County Court of Law No. 3 (the Probate Court) appointed Yollick the Dependent Administrator of the Estate of Herbert Clinton Sisco, and the Debtor and Yollick have been at odds from the day that Yollick was appointed. Yollick sued the Debtor in the Probate Court relating to actions which the Debtor took with respect to his deceased father's property prior to Yollick's appointment; Yollick has alleged that the Debtor violated his various fiduciary duties. Yollick has also complained about actions the Debtor has taken since Yollick's appointment; once again, Yollick has sued the Debtor for violations of his fiduciary duty. For his part, the Debtor has been just as active in the Probate Court. He has filed numerous motions seeking, among other relief, disqualification of Judge Mason Martin, the presiding judge who appointed Yollick, and disqualification of Yollick's counsel for the Dependent Administration. Judge Martin recused himself; however, the motion to disqualify Yollick's counsel was denied. The Debtor has also filed numerous and unsuccessful grievances against Yollick, the attorney for Yollick, Judge Martin, and others who have been involved in the probate proceedings. The Debtor also played a role in ensuring that the Montgomery County District Attorney brought charges against Judge Martin's court reporter, who was convicted of a misdemeanor for her failure to have a court reporter's license. The Debtor has complained about the failure of this court reporter to transcribe a portion of a certain hearing in the Probate Court which the Debtor believes to be very important. All in all, to characterize the proceedings in the Probate Court as contentious would be a gross understatement.

Prior to trial of the above referenced adversary proceeding, the parties underwent mediation, and no settlement was reached.

## II. FINDINGS OF FACT

The facts, in chronological order, are as follows:

1.      Herbert Clinton Sisco had two children. Don Sisco and Jon Sisco (the "Debtor" or "Sisco").

---

was filed on January 17, 2006 (Case, Docket No. 118). Further, on December 27, 2005, Yollick filed the same motion in another adversary proceeding , which is styled *Jon Allan Sisco, Plaintiff vs. Eric Yollick, Dependent Administrator of the Estate of Herbert Clinton Sisco*, Adversary Proceeding No. 05-3198; the Docket Number is 22. In this Memorandum Opinion, all references to Docket Numbers relate to the Docket Sheet in Adversary Proceeding No. 04-3252 unless the word "Case" is placed before the Docket Number, in which event the reference is to the Docket Sheet for this Chapter 13 case.

2.  On February 13, 1990, a guardianship was established for Herbert Clinton Sisco [Yollick Exhibit No. 18] in the County Court at Law No. 3, Montgomery County, Texas. The style of this guardianship is: *In re Estate of H. C. Sisco, Non Compos Mentis*, Number 12,286, in the County Court at Law No. 3, Montgomery County, Texas ("The Guardianship" or the "Guardianship Estate"). [Sisco Exhibit No. 2]. The docket sheet for the Guardianship is attached as Yollick Exhibit No. 18.

3.  On October 15, 1991, Sisco filed an Application for Appointment of Guardian which sought to have Sisco appointed as guardian. [Yollick Exhibit No. 18 K].

4.  On December 13, 1991, the Debtor took an Oath of Guardian. [Yollick Exhibit No. 18 N].

5.  From October 30, 1993 through March 26, 2002, Debtor operated the Guardianship Estate (the "Pseudo Administration Period') as though Herbert Clinton Sisco were still alive, and Debtor took more than $200,000 of funds from the estate for his own benefit.

6.  On October 30, 1993, Herbert Clinton Sisco died. [Sisco Exhibit No. 4].

7.  On August 26, 1998, the Debtor filed a lawsuit which was styled as follows: *Jon Sisco, et al vs. Anderson Columbia Environmental, et al*, in the 221st Judicial District Court of Montgomery County, Texas pursuant to Texas Probate Code § 233A (the "Environmental Law Suit"). [Sisco Exhibit No. 40, page 5, Bates Stamp No. GGOOO2O].

8.  On January 19, 2000, the Debtor, in his individual capacity and in his alleged capacity as the Executor of the Estate of Herbert Clinton Sisco, filed Plaintiff's Second Amended Original Petition against Anderson Columbia Environmental, Inc., Roy F. Weston, Inc. and CF Systems Corporation n/k/a CF Environmental Corporation. [Yollick Exhibit No. 19 B].

9.  In March 7, 2001, Debtor commenced a probate proceeding for Herbert Clinton Sisco's probate estate (the "Probate Estate") in County Court at Law Number 3 of Montgomery County, Texas, under cause number 01-19,407-P (the "Probate Proceeding"). The Probate Proceeding remains open and pending today.

10. On August 29, 2001, Weston Corporation, Inc. represented by Fulbright & Jaworski, a defendant in the Environmental Law Suit filed by the Debtor, filed an objection to the Debtor being appointed as executor of the Probate Estate.

11. On March 18, 2002, the Probate Court decided to order that a dependent administration be put in place and that Yollick be named the Dependent Administrator. Yollick had never before served as a Dependent Administrator. Yollick did not know that Judge Mason Martin was going to appoint him Dependent Administrator until after he was appointed. Judge Mason Martin signed an order for Dependent Administration on that day. [Yollick Exhibit No. 8 and Yollick Exhibit No. 19 G]. The Court declined to appoint an Independent

3

Administrator. The Court ordered Yollick to post a $1,000.00 bond. [Yollick Exhibit 19 H].

12.  On May 3, 2002, Yollick obtained a TRO from Judge Mason Martin, and this TRO (which was a corrected TRO) ordered the Debtor to immediately produce documents. [Sisco Exhibit No. 31] – [Yollick Exhibit No. 19 L].

13.  On January 6, 2004, the Debtor filed a Chapter 7 Petition (Docket No. 1).

14.  On January 12, 2004, Yollick, in his individual capacity, filed a Proof of Claim for "claimed attorney's fees" and set forth that the amount of the claim was "$0.00" (Claim No. 1).

15.  On January 26, 2004, Yollick, in his capacity as Dependent Administrator, filed a Proof of Claim for $271,761.29 (Claim No. 3).

16.  On March 2, 2004, Yollick signed up to receive electronic notices from the Clerk of Court at the following email address: ericyollick@swbell.net. A true and correct copy of the document evidencing that Yollick signed up to receive electronic notices is attached as **Exhibit A** to this Memorandum Opinion.

17.  On March 29, 2004, Yollick filed a complaint pursuant to 11 U.S.C. §§ 523(a)(4) and (a)(6) seeking to prevent discharge of the debt owed by the Debtor to Yollick, in his capacity as Dependent Administrator (the Complaint). This Adversary Proceeding is styled *Eric Yollick, Dependent Administrator of the Estate of Herbert Clinton Sisco, Plaintiff v. Jon Allan Sisco, Defendant,* Adversary No. 04-3252 (the Adversary Proceeding). Yollick, who is an attorney at law, filed the Complaint representing himself *pro se* (Docket No. 1).

18.  On June 15, 2004, the Debtor filed an Answer to the Complaint (Docket No. 8).

19.  On June 24, 2004, the Honorable Robert C. McGuire, a visiting judge in the Southern District of Texas, signed a Comprehensive Scheduling, Pre-trial and Trial Order (the First Pre-trial Order), which the Clerk of Court transmitted to Yollick via email on the same day; the Clerk used the following email address that Yollick designated should be used when he signed up to receive electronic notices: ericyollick@swbell.net. In addition, the First Pre-trial Order was transmitted to Yollick by first class mail on June 26, 2004 at the following address: Eric L. Yollick, Attorney at Law, P. O. Box 7571, The Woodlands, Texas 77387-7571. This address is the one that Yollick used when filing the Complaint. The First Pre-trial Order set forth that trial would be held during the week of March 14, 2005 and that docket call would be held at 9:00 a.m. on March 14, 2005 (Docket No. 10). A true and correct copy of the First Pre-trial Order is attached as **Exhibit B** to this Memorandum Opinion.

20.  On June 24, 2004, Judge McGuire signed a Corrected Comprehensive Scheduling, Pre-trial and Trial Order (the Second Pre-trial Order), which the Clerk of Court also transmitted to

Yollick via email on the same day using the same email address in paragraph 7 above. In addition, the Second Pre-trial Order was transmitted to Yollick via first class mail on June 27, 2004 at the mailing address indicated in paragraph 16 above. The Second Pre-trial Order also set forth that trial would be held during the week of March 14, 2005, and docket call would be held at 9:00 a.m. on March 14, 2005 (Docket No. 11). A true and correct copy of the Second Pre-trial Order is attached as **Exhibit C** to this Memorandum Opinion.

21.      On December 14, 2004, Yollick filed a Motion for Partial Summary Judgment in the Probate Court seeking a determination that the Chapter 7 Trustee, standing in the Debtor's shoes, is the sole distributee of the probate estate of Herbert Clinton Sisco.

22.      On January 24, 2005, the Debtor filed a Motion for Leave to File Counterclaim in the Adversary Proceeding (Docket No. 18).

23.      On February 17, 2005, the Debtor's Chapter 7 case was converted to a Chapter 13 case (Docket No. 55).

24.      On February 24, 2005, this Court held a hearing on the Debtor's Motion for Leave to File Counterclaim in the Adversary Proceeding. A transcript of this hearing is attached to this Memorandum Opinion as **Exhibit D.**

25.      On March 14, 2005, pursuant to the First Pre-trial Order and the Second Pre-trial Order, this Court held Docket Call. Counsel for the Debtor in the Adversary Proceeding, J. Douglas Sutter (Sutter), and general counsel for the Debtor in his bankruptcy, Johnie Patterson (Patterson), appeared at this Docket Call, but Yollick did not. Patterson appeared in person in the Courtroom, whereas Sutter appeared by telephonic conference. The Court took a recess and attempted to reach Yollick by telephone out of courtesy, but initially had no success, as his law office had a voice mail machine in effect when the call was made. A message was left for Yollick that if he wanted to attend the hearing by telephone, he should call in. The Court began holding the hearing, during which time the Court made rulings on pleadings that it had reviewed in chambers. Specifically, the Court, on the record, announced that it would grant the Debtor's Motion for Leave to File Counterclaim, the Debtor's Application for Authority to Employ Kelly, Sutter and Kendrick as Special Counsel, and the Plaintiff's Motion for Extension of Submission Date on Debtor's Motion for Leave to File Counterclaim and on other Scheduling Order deadlines. During the hearing, Yollick, responding to the Court's earlier phone call, called in to participate by telephone. The Court took a second recess so that Yollick could be conferenced into the hearing. Upon returning to the bench, with Yollick now present by telephone, the Court repeated its rulings so that Yollick would be aware of them. The Court signed the three orders referenced at the hearing and they were entered on the docket on the same day. (Docket Nos. 32 and 33; Docket No. 30).

26.   On March 22, 2005, Yollick filed a Jury Demand in the Adversary Proceeding.  This jury demand was signed by Steve Rech (Rech) as counsel for Yollick.  Rech has represented Yollick in the Adversary Proceeding since this date (Docket No. 43).

27.   On March 23, 2005, Yollick filed a Motion for Withdrawal of Reference of the Adversary Proceeding (Docket No. 44).

28.   On March 24, 2005, Yollick filed a Motion for Leave to Appeal the Order granting the Debtor's Motion to File Counterclaim (Docket No. 46).

29.   On April 6, 2005, this Court signed an Order granting Yollick's Motion to Withdrawal (sic) Eric Yollick, Dependent Administrator of the Estate of Herbert Clinton Sisco's Motion to Quash Debtor's Amended Notices of Intention to Take Oral Deposition of Eric Yollick and Subpoena Duces Tecum and Request for Emergency Hearing" (Docket No. 61).

30.   On April 7, 2005, the Debtor filed a Complaint against Yollick seeking a turnover of certain property.  This adversary proceeding is styled *Jon Allan Sisco, Plaintiff v. Eric Yollick, Defendant*, adversary number 05-3198 (the Turnover Proceeding) (Docket No. 1).

31.   On April 8, 2005, this Court held a hearing on the Debtor's Application for Temporary Restraining Order Against Yollick in the Turnover Proceeding.  Rech appeared as counsel for Yollick in this lawsuit as well.  The Court continued this hearing until April 21, 2005.

32.   On April 21, 2005, the hearing that began on April 8 was completed.  Based upon the testimony of the Debtor and Yollick, this Court ruled that the Debtor had satisfied the elements necessary to obtain a TRO, and therefore the Court granted the Application. Specifically, testimony was adduced and documents introduced showing that certain tangible assets in Yollick's possession—primarily vehicles—were titled in the Debtor's name and therefore constituted property of the bankruptcy estate.  The Court therefore ordered that Yollick cease his possession of these particular tangible assets and turn them over to the Debtor.

33.   On April 27, 2005, the Court signed the TRO in the Turnover Proceeding. (Turnover Docket No. 6).

34.   On May 5, 2005, in the Turnover Proceeding, Yollick and the Debtor, through their attorneys, entered into an Agreed Preliminary Injunction and Order for Turnover of Property of the Estate (Turnover Docket No. 10).

35.   On May 5, 2005, Yollick filed a Notice of Approval of Dependent Administrator's Bond (Docket No. 69).

36.   On May 27, 2005, Yollick filed an Answer in the Turnover Proceeding (Turnover Docket

6

No. 13).

37.   On June 6, 2005, the Honorable United States District Judge Sim Lake issued a Memorandum Opinion and Order denying Yollick's Motion for Leave to Appeal this Court's Order of March 14, 2005, granting leave to the Debtor to file his counterclaim (Docket No. 97).

38.   On July 8, 2005, this Court signed an Order entitled "Order Denying Debtor's Emergency Motion to Reconsider and Vacate Order Lifting Stay" (Case, Docket No. 97).

39.   On July 8, 2005, this Court signed an Order entitled "Order Denying Debtor's Emergency Motion for Status Conference and to Approve Procedure for Review and Final Allowance of Attorney Fee Claims Against the Estate of Sisco" (Case, Docket No. 98).

40.   On July 22, 2005, this Court issued its Report and Recommendation to the United States District Court regarding Yollick's Motion for Withdrawal of Reference in the Adversary Proceeding. This Court recommended that Yollick's Motion for Withdrawal of Reference be denied.

41.   On July 28, 2005, Yollick filed a Brief in Support of the Motion for Withdrawal of Reference and also a response to this Court's recommendation that the motion be denied (Docket No. 130).

42.   On August 3, 2005, the Honorable United States District Judge Sim Lake denied Yollick's Motion for Withdrawal of Reference (Docket Nos. 127 and 132).

43.   On August 8, 2005, this Court issued an order setting a status hearing on the Adversary Proceeding for August 9, 2005 (Docket No. 136).

44.   On August 9, 2005, various issues were discussed at the status hearing, including whether the parties would attempt mediation, when trial would be held if no settlement was reached, and whether Yollick should post a bond for the benefit of the bankruptcy estate. This Court ruled from the bench that Yollick would need to post a $20,000.00 bond under certain circumstances.

45.   On August 12, 2005, the Debtor's counsel submitted a proposed order requiring Yollick to obtain a bond (Docket No. 141).

46.   On August 16, 2005, Yollick filed a Response to the proposed order requiring him to obtain a bond (Docket No. 144).

47.   On August 16, 2005, this Court signed an order requiring Yollick to obtain a bond (Docket No. 143).

48. On August 23, 2005, the Debtor filed a Motion to Quash Notice of Intention to Take the Deposition of Jon A. Sisco (Docket No. 152).

49. On August 25, 2005, this Court denied the Debtor's Motion to Quash Yollick's Notice of Intention to Take Deposition of Jon A. Sisco (Docket No. 155).

50. On August 26, 2005, this Court signed an order denying Yollick's demand for a jury trial in the Adversary Proceeding (Docket No. 156).

51. On September 9, 2005, Yollick filed a Motion to Dismiss the Counterclaims against him for lack of subject matter jurisdiction in the Adversary Proceeding (Docket No. 166).

52. On September 13, 2005, Yollick filed a Motion for Summary Judgment in the Adversary Proceeding (Docket No. 170).

53. On September 16, 2005, the Debtor filed a Motion for Summary Judgment in the Adversary Proceeding (Docket No. 181).

54. On October 21, 2005, Yollick filed a second Motion for Summary Judgment in the Adversary Proceeding (Docket No. 221).

55. On November 7, 2005, Yollick and the Debtor, through their respective attorneys, Rech and Sutter, filed a Joint Pre-trial Order (Docket No. 251).

56. On November 7, 2005, Yollick also filed his own Proposed Findings of Fact and Conclusions of Law (Docket No. 236).

57. On November 15, 2005, this Court orally denied Yollick's Motion to Dismiss (Docket No. 252) and the Debtor's Motion for Summary Judgment. Additionally, the Court orally granted in part and denied in part Yollick's Motion for Summary Judgment.

58. On November 16, 2005, this Court signed an order requiring Judicial Watch, Inc. to immediately produce to Yollick those documents that he requested in his subpoena of this entity (Docket No. 253).

59. On November 16, 17, 18, 21, and 22, 2005, trial was held in the Adversary Proceeding. After the Debtor closed with respect to his counterclaims against Yollick, Yollick moved for judgment as a matter of law. At the end of the November 22 hearing, this Court informed counsel for Yollick and the Debtor that this Court would issue a show cause order, the hearing on which would be held on December 8, 2005. The Court further ruled that it would draft a show cause order setting forth that Yollick would need to show cause why he should not be sanctioned for a lack of candor with this Court at the February 24, 2005 hearing (Docket No. 259). The Court also ruled that the Court would consider any testimony and

evidence relating to this show cause order as part of the record for the Adversary Proceeding itself.  A true and correct copy of this Show Cause Order is attached to this as **Exhibit E** to this Memorandum Opinion.

60.   On December 8, 2005, this Court signed an order denying Yollick's Motion for Judgment as a Matter of Law (Docket No. 274).

61.   On December 8, 2005, Yollick filed a Response to the Show Cause Order as well as a separate brief (Docket Nos. 271 and 272).  On this same day, Leonard H. Simon (Simon) filed a notice of appearance with this Court setting forth that he would be the attorney-in-charge representing Yollick at the show cause hearing (Docket No. 270).

62.   On December 8, 2005, the show cause hearing began, and several witnesses gave testimony. The hearing was continued until December 15, 2005, and thereafter was continued until December 16 (Docket No. 270).  Yollick's counsel for the show cause hearing was not Rech, but rather Simon.

63.   On December 16, 2005, the show cause hearing continued and further testimony was given. The hearing was continued until December 21, 2005.

64.   On December 19, 2005, Yollick, through his attorney, Simon, filed the Motion to Disqualify the undersigned judge (Docket No. 276).

65.   On December 20, 2005, the Debtor filed a Response opposing the Motion to Disqualify (Docket No. 280).

66.   On December 21, 2005, the show cause hearing was concluded, and the Court took the matter under advisement after hearing closing arguments from the Debtor's counsel, Sutter, and Yollick's counsel for the show cause hearing, Simon.

67.   On December 22, 2005,  this Court heard closing arguments from the Debtor's counsel, Sutter, and Yollick's counsel, Rech, on the merits of the parties' respective causes of action in the Adversary Proceeding.  At the beginning of this hearing, this Court inquired of Rech whether Yollick's Motion to Disqualify related only to the Show Cause Order or whether it also related to the Adversary Proceeding.  Rech responded that the Motion to Disqualify covers  both the Show Cause Order as well as the Adversary Proceeding.  This Court also inquired of Sutter whether the Debtor supported or opposed the Motion to Disqualify.  Sutter responded that the Debtor opposed this motion.

### III. CONCLUSIONS OF LAW

**A.      28 U.S.C. § 455 governs the Motion to Disqualify.**

Yollick bases the Motion to Disqualify on 28 U.S.C. § 455.  Section 455(a) provides that a judge "shall disqualify himself in any proceeding in which he is presiding in which his impartiality might reasonably be questioned."  Section 455(b)(1) requires disqualification where a judge "has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."   Yollick also cites Cannon 3C (1) of the Code of Judicial Conduct, which states: "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which . . . (a) the judge has a personal bias or prejudice concerning a party. . ."

In this Circuit, a motion to disqualify a judge is committed to the discretion of the targeted judge. *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir. 1999).  A judge has broad discretion in determining whether disqualification is appropriate. See, e.g., *United States v. Mizell*, 88 F.3d 288, 299 (5th Cir. 1996) (citing *Matter of Hipp, Inc.*, 5 F.3d 109, 116 (5th Cir. 1993).  Accordingly, this Court will adjudicate the Motion to Disqualify.

A movant seeking disqualification bears the burden to prove that the targeted judge is not qualified by establishing facts challenging impartiality. *In re Betts*, 143 B.R. 1016, 1022 (N.D. Ill. 1992) (citing *Clay v. Doherty*, 608 F. Supp. 295, 299 (N.D. Ill. 1985)).  This burden is substantial, and the movant must overcome a presumption of impartiality. *Njie v. Lubbock County, Texas*, 999 F. Supp. 858, 860 (N.D. Tex. 1998).

**B.      Yollick has failed to show that the undersigned judge has obtained any information through extrajudicial sources.**

Yollick asserts that the undersigned judge has shown, in his words, "pervasive bias and prejudice against me in this Adversary Proceeding and in the other proceedings before him. His lack of impartiality is both extrajudicial and, in part, based upon his pervasive bias and prejudice within this judicial proceeding."  In considering a motion to disqualify pursuant to 28 U.S.C. § 455(a), the Court applies the objective standard of whether a reasonable person with knowledge of the relevant facts would conclude that the judge's impartiality might reasonably be questioned. *Cheney v. United States Dist. Ct.*, 541 U.S. 913, 924 (2004); *Microsoft Corp. v. United States*, 530 U.S. 1301, 1302 (2000); *Liteky v. United States*, 510 U.S. 540 (1994);  *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 850 (1988);  *Parrish v. Bd. of Comm'rs of Alabama State Bar*, 524 F.2d 98, 103 (5th Cir. 1975).

The Fifth Circuit has held that "each section 455 (a) case is extremely fact intensive and fact bound, and must be judged on its unique facts and circumstances rather than by comparison to similar situations considered in prior jurisprudence." *United States v. Anderson*, 160 F.3d 231, 234 (5th Cir. 1998); *United States v. Jordan*, 49 F.3d 152, 157 (5th Cir. 1995); See also *United States*

v. *Bremers*, 195 F.3d 221, 226 (5th Cir. 1999). Although it is not always dispositive whether bias and prejudice originates from an "extrajudicial source," it is a significant (and often determinative)" factor in considering recusal. *Liteky v. United States*, 510 U.S. 540, 554-55 (1994). In other words, if an "extrajudicial source" is present, then recusal is very likely; if it is not present, then recusal is very unlikely. The "extrajudicial source" limitation applies to both §§ 455(a) and 455(b)(1), *Liteky* at 551 and 554.

What constitutes an "extrajudicial source"? A state court in Texas looked to a Seventh Circuit decision on this issue:

> The [*Edgar*] court distinguished between "personal knowledge" and knowledge gained in judicial capacity because information from the latter source enters the record and may be controverted or tested by tools of the adversary process. Knowledge received in other ways, which can neither be accurately stated nor fully tested, is "extrajudicial." The [*Edgar*] court found that off-the-record discussions on substantive issues in chambers constitute "personal" or "extrajudicial" knowledge in the sense the information conveyed to the judge leaves no trace in the record and cannot "be controverted or tested by the tools of the adversary process." *Moseley, Jr. v. Texas*, 141 S.W.3d 816, 835 (Tex. App.–Texarkana 2004) (explaining *Edgar v. K.L.*, 93 F.3d 256 (7th Cir. 1996). (citations omitted).

Yollick has failed to show the existence of any extrajudicial knowledge in this case. All of this Court's knowledge has come from pleadings filed, witness testimony, introduction of exhibits, and counsel argument in open court. This Court has never had a chambers conference, or off-the-record discussion anywhere else, with anyone involved in this Adversary Proceeding about any of the issues in the suit. Yollick's failure to show that there are any extrajudicial sources of bias and prejudice is a significant factor that weighs against his Motion to Disqualify. Yollick is therefore left with having to prove that the undersigned judge has personal bias or prejudice against Yollick even though there is a complete absence of extrajudicial knowledge.

### C.    Yollick has failed to prove that the undersigned judge has personal bias or prejudice against either Yollick or the Montgomery County courts.

In support of his Motion to Disqualify, Yollick argues several points. The Court describes these points and analyzes each of them below.

**Yollick Point No. 1:**  Yollick asserts that the undersigned judge had *ex parte* communications with the Debtor's counsel at the March 14, 2005 hearing. This is a hearing at which Yollick did not initially appear but, after this Court telephoned his law office and left a voice mail message, he phoned in from his car phone. Yollick asserts that the day before the hearing, he checked the Court's Internet Website and reviewed the docket sheet for March 14, and no hearing in the Adversary Proceeding was scheduled. Therefore, he contends, no hearing should have been held and this Court's communications on the record with the Debtor's counsel during the time he

was not present on the phone constitute *ex parte* communications. Yollick further contends that aside from the absence of the hearing on the Court's website docket sheet, the undersigned judge, at the February 24 hearing, led him, and the Debtor's counsel, to believe that there would be no further hearings in the Adversary Proceeding until this Court issued a ruling on the Debtor's motion for leave to file a counterclaim. Yollick cites the following statement which this Court made at the February 24 hearing in support of his position that no hearing was scheduled, or should have been held, on March 14:

> "I recognize that there is a lot of acrimony in this case and I'll look at the documents that you're going to give me and then I'll make a decision on the pending pleadings. And then depending upon what I do with the pending pleadings, I may set another status conference or I may just issue an order setting forth when trial should be held."

**Analysis:** On June 24, 2004, the Honorable Robert C. McGuire, who was a visiting judge at this time to whom the Adversary Proceeding was assigned, issued the First Pre-trial Order and the Second Pre-trial Order. Both of these orders set forth that docket call would be held at 9:00 a.m. on March 14, 2005. Neither Judge McGuire nor the undersigned judge ever issued an order cancelling or continuing this docket call. These orders were emailed to Yollick on June 24, 2004. In addition, the First Pre-trial order was sent to Yollick via regular first class mail on June 26, 2004 at the following address: Eric L. Yollick, Attorney at Law, P. O. Box 7571, The Woodlands, Texas 77387-7571. The Second Pre-trial order was mailed to Yollick via first class mail on June 27, 2004 at the same address. He was therefore on notice several months prior to the March 14, 2005 docket call that such a docket call was scheduled to be held. The Debtor's counsel did appear at the docket call, so the Court can only presume that the Debtor's counsel properly calendered this docket call and Yollick did not.[2] The fact that the docket call was not on this Court's website is no excuse for Yollick not to appear. If he had properly calendered the docket call when he received the First Pre-trial Order and the Second Pre-trial Order, he would have known that a docket call was scheduled. And, after checking what should have been calendared within his office as a docket call for March 14, if he had any doubt that the hearing would be held because it was not shown on the Website Docket Sheet, he could have, and should have, called this Court's case manager to inquire about the matter.

A pleading which Yollick filed in this Court on February 14, 2005 also shows that he knew of the docket call scheduled for March 14, 2005. On February 14, Yollick filed a Motion to Extend

---

[2]In the Motion to Disqualify, on page 8, in paragraph 16, Yollick swears that "Upon information and belief, Debtor's counsel Johnie Patterson ('Patterson') by coincidence saw the matter listed on the Court's paper docket sheet posted outside the Courtroom on the morning of March 14, 2005 and then called Debtor's trial counsel, J. Douglas Sutter ('Sutter'), who was at home, and told Sutter about the hearing. Upon information and belief, Patterson then attended the March 14, 2005, hearing in person, while Sutter attended that hearing by telephone." As of the date of this Memorandum Opinion, there is nothing in the record from the show cause hearing to substantiate or refute Yollick's rendition as to whether Sutter received notice of the March 14 hearing in this fashion.

Time of Submission Date on Debtor's Motion for Leave to File Counter-Claim and on Other Scheduling Order Deadlines (Docket No. 19). In this motion, Yollick sets forth that "Today, February 14, 2005, is the deadline for the parties to file their witness lists, their exhibit lists and their joint pretrial order." The only way that Yollick could know of this deadline is through reviewing Judge McGuire's orders of June 24, 2004. Those same orders set forth that docket call would be held at 9:00 a.m. on March 14, 2005. Accordingly, there is no question that Yollick had ample notice of the March 14 docket call. His failure to appear was due to his own negligence.

Further, no statement that this Court made at the February 24, 2005 hearing could reasonably be construed to mean this Court orally cancelled the docket call scheduled for March 14, 2005. The statement made by this Court referred to by Yollick was as follows: " I recognize that there is a lot of acrimony in this case and I'll look at the documents that you're going to give to me and then I'll make a decision on the pending pleadings. And then depending upon what I do with the pending pleadings, I may set another status conference or I may just issue an order setting forth when trial should be held." (Transcript of February 24 Hearing, page 31, lines 19 through 24). This Court made no mention of the docket call scheduled for March 14, 2005. Moreover, this Court stated it "may" set another status conference or "may" just issue an order setting forth when trial should be held—as opposed to saying this Court "would definitely" or "certainly" issue an order setting another status conference or trial setting. Hence, even if Yollick believed the term "status conference" or "trial date" could be construed as having the same meaning as "docket call," the Court's use of the word "may" should have led Yollick to ask himself whether he needed to check with the Court's case manager to determine if the docket call had been cancelled. Case law is clear that an attorney has a duty to monitor his own docket so that he keeps up with when hearings have been scheduled. *In re Anderson*, 330 B.R. 180, 187 (Bankr. S.D. Tex. 2005) (citing *In re Shepherds Hill Dev. Co., LLC*, 316 B.R. 406, 415 (lst Cir. BAP 2004); *In re Warrick*, 278 B.R. 182, 187 (9th Cir. BAP 2002).

Yollick contends that this Court's beginning the March 14 hearing without him appearing constitutes "*ex parte*" contacts with the Debtor's counsel. Yollick is wrong. The phrase "*ex parte*" means "done or made at the instance and for the benefit of one party only, and without notice to, or argument by, any person adversely interested". *Black's Law Dictionary*, 597 (7th ed. 1999). The on-the-record communications that this Court had with Debtor's counsel at the March 14, 2005 hearing were not done or made at the instance of the Debtor. Judge McGuire scheduled the docket call, not the Debtor or its counsel. Moreover, and most importantly, these communications were not done without notice to Yollick. The First Pre-trial Order and the Second Pre-trial Order gave him ample notice of the docket call. His failure to appear was entirely his own doing. Statements made at a hearing that the Movant failed to attend despite proper notice do not constitute *ex parte* communications. In *Betts*, the court denied the Debtor's motion to recuse and found Debtor's argument that the hearing he failed to attend was *ex parte* to be "blatantly incorrect." *In re Betts*, 143 B.R. at 1022. The *Betts* court reasoned as follows:

> The Debtor's conclusion that the nature of the hearing at which the Debtor failed to appear is *ex parte* is simply erroneous and illogical. To so find would transform all court hearings where one side defaults and does not appear after a prima facie

showing of notice is made, to those of *ex parte* proscribed nature.  Such hearings would become *ex parte* through the simple ploy of one party failing to appear.  *Id.*

In addition to being properly noticed, all of the communications this Court had with the Debtor's counsel at the March 14, 2005 hearing (during that portion of the hearing when Yollick was not present) were done on the record.  Indeed, there is a transcript to reflect exactly what was said during the entire hearing (both during Yollick's absence and his presence), and Yollick has been able to obtain this transcript.[3]

This Court would also note that when Yollick failed to appear at the hearing, this Court recessed and attempted to contact Yollick by telephone to patch him into the hearing.  The Court had no duty to do so but did so out of courtesy and in an effort to ensure that Yollick was given every opportunity to attend.  Yollick was not at his office when the Court called, nor was there anyone who was present at the office to answer the phone call and attempt to locate Yollick to alert him of the hearing.  Therefore, a message was left on the answering machine for Yollick to call in if he so desired.  Rather than wait to determine if Yollick would check his voice mail, the Court chose to commence the hearing, and the Court proceeded to issue rulings on the pleadings that it had under consideration.  Approximately fifteen minutes later, the Court learned that Yollick had listened to his voice mail and  was attempting to participate in the docket call by telephone; therefore, the Court took a second recess, which the Court was under no duty to do, to ensure that he could be conferenced into the hearing so he could participate.  Yollick thereafter was in attendance for the remaining seventeen minutes of the hearing, and this Court repeated its rulings once Yollick joined the hearing via telephone.

In the following sentence,  which is set forth in paragraph 18 in his Motion to Disqualify, Yollick also suggests that this Court had *ex parte* communications with Sutter prior to the hearing: "Somehow, the Court knew that Sutter was ill, although no previous reference to that illness exists in the transcript."  Apparently, Yollick, in reviewing the transcript of the March 14 hearing, noticed that the undersigned judge, at the beginning of the hearing, without being told by Sutter on the record, asked Sutter, who was appearing by phone, the following question: "I understand you're ill this morning?"—to which Sutter responded in the affirmative.  Yollick seems to suggest that the undersigned judge knew that Sutter was ill because the undersigned judge had communicated with Sutter off the record before the hearing.  Yollick is incorrect.  The undersigned judge has never communicated with Sutter on any matter off the record.  Rather, the undersigned judge probably learned of Sutter's illness prior to the hearing through conversing with the Court's courtroom deputy.

---

[3]Yollick complains in paragraph 17 of the Motion to Disqualify that he had difficulty obtaining the Transcript.  What he fails to state in the Motion is just exactly when he tried to obtain the transcript of the March 14 hearing.  The records of the Clerk's Office reflect that Yollick ordered this transcript at 9:32 a.m. on December 13, 2005 and received the transcript later that same day.  A true and correct copy of the Transcript Order is attached as **Exhibit F** to this Memorandum Opinion.  The turn around time was, in a word, exceptional.  Yollick can hardly complain about such speed on the part of the Clerk's Office or the office of the Court Reporter who transcribed the hearing.

14

Patterson probably informed this courtroom deputy of Sutter's illness when he first entered the courtroom, which was prior to the undersigned judge taking the bench.[4] There is nothing inappropriate about one attorney informing the courtroom deputy that his co-counsel is ill and wants to appear by telephone; and there is nothing inappropriate about the courtroom deputy informing the undersigned judge, prior to his taking the bench, that the counsel of record for the Adversary Proceeding is going to appear by telephone. By having this knowledge prior to taking the bench, the undersigned judge knows that when he takes the bench, there is someone appearing by telephone and that the Court needs to recognize that person by asking him or her to make an appearance for the record.

Yollick also asserts that this Court did not express disenchantment with him when he joined the hearing and that therefore this Court's subsequent reference to Yollick's failure to appear evidences prejudice against him. This Court was not pleased with Yollick's failure to appear and, in fact, inquired of him why he was not present when he first joined in the hearing. Yollick stated that he was driving to a funeral. Rather than require him to appear in the courtroom in person, this Court instructed him to keep driving to the funeral. When Mr. Yollick once again began apologizing for his absence, this Court, out of courtesy to Yollick in view of the fact that he was driving to a funeral and in order to move the hearing along, simply said "Mr. Yollick, it's okay"–and then the Court proceeded to repeat its rulings for Yollick's benefit. Yollick's argument in the Motion to Disqualify that this Court was not initially unhappy with his absence is disingenuous given all the circumstances concerning the March 14, 2005 hearing. This Court was indeed unhappy with Yollick for his failure to appear. Such unhappiness, however, is not a basis for disqualification. Alleged bias stemming from a judge's reaction to an attorney's failure to appear does not mandate disqualification. See *In re Celotex Corp.*, 137 B.R. 868, 875-76 (Bankr. M.D. Fla. 1992) (finding that judge's use of the words "disdain," "chutzpah," and "manipulative" or "manipulate" after an attorney failed to appear does not warrant recusal); *Yesbick v. State*, 408 So.2d 1083, 1085 (Fla. Dist. Ct. App. 4th Dist. 1982) *dismissed without opinion*, 417 So.2d 331 (Fla. 1982) (holding that judge's alleged bias resulting from an attorney's failure to appear at trial date was an insufficient basis for disqualification).

Finally, this Court would note that Judge McGuire's order of June 24, 2004 expressly stated that "Counsel are hereby directed to attend a docket call on March 14, 2005 at 9:00 a.m. . . . ." The order further states that "failure to comply with this Order may result in sanctions including, but not limited to, dismissal of the action and/or assessment of attorneys' fees and costs." Pursuant to this Order, this Court could have sanctioned Yollick for failing to appear at the March 14 docket call. Not only did this Court not take such action; when Yollick failed to appear, this Court telephoned his law office in an effort to allow him participate from the outset of the hearing by telephone. The fact that Yollick was not at his firm when the Court called him does not diminish this Court's effort in attempting to reach him. Moreover, this Court could have chosen not to have left a voice mail on

---

[4]The Court would also note that the undersigned judge has had no off-the-record conversations with Patterson about any issue relating to the Adversary Proceeding, so Patterson has never made any off-the-record statements to the undersigned judge about Sutter's illness.

Yollick's answering machine.  However, this Court did so.  As a result, Yollick did receive the message that the hearing was going forward, and he called in to join the hearing.  The Court had no duty to recess the hearing in order to patch Yollick in by telephone, but the Court did so in order to ensure that Yollick could  participate for the remainder of the hearing (which was approximately another seventeen minutes). Under these circumstances, this Court finds that any reasonable person with knowledge of these facts would view the Court's conduct as not only **not** showing bias and prejudice towards Yollick, but as showing courtesy towards him and restraint in not imposing sanctions against him.  The Court finds that its conduct reflects no bias and prejudice towards Yollick and the Probate Court.

**Yollick Point No. 2:**  Yollick asserts that the undersigned judge has shown extrajudicial bias and prejudice against both the Probate Court and him.  Specifically, Yollick states that the following statements made by this Court reflect such bias and prejudice:

(a) Statement No. 1: "I think that Mr. Yollick is an uninsured independent administrator."

**Analysis:**  The Court made this statement as a conclusion of law when it issued its ruling from the bench in the Turnover Proceeding after listening to testimony and reviewing exhibits. [Transcript of April 21 Hearing (Ruling of the Court), page 6, line1]. The Court made this finding while assessing whether there was a substantial threat to the Debtor if the TRO was not granted.  In the Turnover Proceeding, the property for which the Debtor sought a turnover comprised tangible assets (such as vehicles); and this Court was concerned that because Yollick did not have a proper bond, the assets in Yollick's possession which where titled in the Debtor's name were at risk and represented a substantial threat to the Debtor in whose name the assets were titled.  The testimony and the exhibits convinced this Court that Yollick did not have a proper bond in place in his capacity as the dependent administrator.  While the transcript reflects that this Court used the word "independent," [Transcript of April 21 Hearing (Ruling of the Court), page 6, line 1], the Court meant to say "dependent."  Yollick seems to believe that this finding of fact reflects this Court's bias and prejudice against the Probate Court.  The Court fails to see how Yollick arrives at this conclusion.  Yollick testified at this hearing that his bond was approved, but he was evasive [Transcript of April 21 Hearing, page 4, line 21 through page 9, line 6] when asked how it was approved in view of the fact that the probate judge had never signed the bond, as required by Section 197 of the Texas Probate Code. Based upon Yollick's testimony that the Montgomery County judge had never signed the bond,  this Court concluded that Yollick was uninsured.  No one in the courtroom on that day requested the undersigned judge to correct the finding that Yollick was an "independent" administrator instead of a "dependent" administrator. Both Yollick and his attorney, Rech, had the opportunity to do so, but they did not. Indeed, as this Court typically does after issuing a ruling from the bench, the Court inquired as to whether anyone had questions or comments about the ruling. [Transcript of April 21, 2005 Hearing, page 9, lines 12 - 13].  Rech, in fact, did have questions, but not about this Court's finding that Yollick now claims reflects this Court's bias. [Transcript of April 21, 2005 Hearing, page 9, line 12 through page 11, line 18].  Accordingly, Yollick has waived his right to complain about this Court's use of the word "independent" *Alford*

16

*Meroney & Co. v. Rowe*, 619 S.W. 2d, 210, 213-14 (Tex. Civ. App. -Amarillo 1981, writ ref'd n.r.e.) ("Waiver may be established by proof that the party possessing a known right expressly relinquishes it or acts in a manner inconsistent with, or fails to act in a manner consistent with, an intent to claim the right.").

Aside from Yollick's failure to complain about  this issue at the end of the April 21 hearing—or, for that matter, at any time thereafter until December 20, 2005—there is a further point. In *Liteky v. United States*, 510 U.S. 540, 555 (1994), the Supreme Court of the United States, in discussing 28 U.S.C. § 455(a), stated that:

> [J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion. *See United States v. Grinnell Corp.*, 384 U.S., at 583, 86 S. Ct., at 1710. In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost inevitably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the courts of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. (emphasis added).

This Court's finding that Yollick was uninsured was based solely upon the testimony that Yollick himself gave and the absence of a bond signed and approved by the probate judge.  Under *Liteky*, such a ruling does not constitute a valid basis for the Motion to Disqualify.

(b)  Statement No. 2:  "And I find it - - I have to say I find Mr. Yollick's credibility suspect. There is something that bothers me when a lawyer takes the stand and says, well, he has it on good information that this bond is with the Clerk's office and has been approved, almost suggesting to me that he's had a private conversion with the Court; or if he hasn't he heard, had a private conversation with the Clerk of the Court.  I don't know how things are going on up there in Montgomery County, but what I do know is the testimony is that the court has not signed the bond."

**Analysis:**  The Court made these comments to ensure that the record set forth what this Court thought of Yollick's credibility about the bond.  Under cross examination, Yollick insisted that his bond was proper and yet had to concede that the probate judge had never signed and approved the bond—which is exactly what § 197 of the Texas Probate Code requires TEX PROB. CODE ANN

§ 197 (Vernon 2005). As he made a concerted effort to stand his ground that the bond was valid, Yollick testified as follows:

> Q.  Okay, that's the answer to my question. And has the judge approved that bond?
>
> A.  My understanding is yes.
>
> Q.  You have a signed approved bond from the judge?
>
> A.  It was not signed by the judge, but it was approved.
>
> Q.  Okay, then how do you get to his approval if he hasn't signed it?
>
> A.  Because it was filed with the clerk.

[Transcript of April 21 Hearing, page 7, lines 1 - 8].

Once again, the Court's ruling–this time on Yollick's credibility–came from Yollick's own testimony. The Court listened to Yollick's testimony and observed Yollick while he was testifying, and he gave the distinct impression that knew that the bond was approved even though he conceded that the probate judge had never signed the bond. The exchange between the Debtor's counsel and Yollick set forth above concerned this Court because Yollick was contradicting himself by confidently asserting that the bond was approved even though it was not signed by the probate judge. Accordingly, in commenting on Yollick's credibility, this Court stated it was bothered by testimony from an attorney who appeared to be suggesting that he somehow knew the probate judge had approved the bond when the judge had never signed the bond. Under *Liteky*, this Court's ruling on Yollick's credibility provides no basis for the Motion to Disqualify.

There is a further point about this Court's granting the TRO in the Turnover Proceeding. On May 5, 2005, eight days after this Court granted the TRO, the Debtor and Yollick, through their attorneys, entered into an Agreed Preliminary Injunction and Order for Turnover of Property of the Estate (Docket No. 10). If Yollick really believed that this Court was biased and prejudiced against him based upon this Court's statement set forth above, no reasonable person with knowledge of these relevant facts would believe that Yollick would enter into an agreed preliminary injunction. Just the contrary: any reasonable person would think that this was the time that Yollick would seek disqualification. Instead, Yollick made no mention of any alleged bias or prejudice that this Court has towards the Probate Court. He certainly had sufficient time to raise this issue if he really believed that this Court's ruling on April 27 reflected bias or prejudice towards the Probate Court. His signing of the agreed preliminary injunction in May and his waiting 8 months to allege that this Court's ruling of April 27 reflects bias or prejudice toward the Probate Court calls into question whether Yollick really believes what he now alleges.

(c) <u>Statement No. 3: "You know, one way or the other and if it means I have to issue an order, I'm going to get this moving, because it's not moving up in Montgomery County."</u>

**Analysis:** Yollick asserts that the Court's statement shows extrajudicial bias and prejudice against the Probate Court. This Court disagrees. This Court has been concerned about the length of time it has taken to wind up the affairs of the Estate of Herbert Clinton Sisco. The words cited by Yollick in no way impugn the integrity or dignity of the Probate Court. By making the statement it did, the Court hoped to persuade Yollick and the Debtor—as opposed to the probate judge—that they needed to press on in the probate proceedings so that distributions could be made to claimants and to the Debtor as quickly as possible. The Court's desire to see a distribution made to the Debtor in the near future arises from the Court's duty to ensure that the Debtor's bankruptcy estate receives monies that can be used to pay allowed claims in this bankruptcy. This Court has never issued an order to the Probate Court, nor will it. Yollick's complaint about the Court's words do not come within hailing distance of showing bias or prejudice against the Courts of Montgomery County, Texas.

(d) <u>Statement No. 4: "I don't know why the probate court and the folks up in that county (Montgomery County) decide what you can do, but I find it unprofessional that you're signing your name "Bulldog" Yollick.</u>

**Analysis:** Yollick asserts that this Court's words reflect bias and prejudice against the Montgomery county courts. This Court begs to differ. The first hearing that the undersigned judge held in the Adversary Proceeding was on February 24, 2005. By this time, the Debtor, through its counsel, Sutter, had filed the Motion for Leave to File Counter Claim, to which was attached the proposed counterclaim. Prior to this hearing, the Court had reviewed the proposed counterclaim and noticed that it contained some vituperative language. For example, Paragraph 15 of the proposed counterclaim alleged that "It can now be demonstrated that the dependent administration of the probate estate has been maintained for years for the benefit of Yollick and Green at the expense of the Debtor. It is not a bad job is (sic) you can find it. It is no wonder that the average person no longer trusts the legal profession, especially that which operates in the Texas Probate Courts." During the hearing, this Court told Sutter that the language in this paragraph was an *ad hominem* attack on Yollick; that such language has no place in the pleadings; and that Sutter should not use such language in future pleadings. This Court also took Sutter to task for styling the counterclaim against Eric "Bulldog" Yollick. Sutter responded that this name was how Yollick signed his pleadings.

The Court then instructed Yollick to refrain from signing his pleadings as "Bulldog" Yollick, and that he should sign them as Eric Yollick. The Court told Yollick that in the Court's view, it was unprofessional to sign his name "Bulldog" Yollick. This Court went on to say the following:

> I mean, you know, Mr. Yollick, I can only tell you, you know, just looking at these pleadings, I mean, how do you think the average lay person would feel if you showed them these pleadings? We've got one attorney who is signing his name

"Bulldog" Yollick and another attorney who is making some serious personal attacks against you. That strikes me as what leads people to believe that the legal profession is stooping a bit low.

So, I've said my peace. I don't want to belabor the point, I think you get my point. I think the best thing to do now is to get me the documents that I've asked for and I'll make a ruling."

Yollick apologized to the Court and stated that he had stopped using this nickname in the last two months. The Court was satisfied with his statement at the time.[5]

Now, approximately ten months later, after numerous hearings and a lengthy trial, Yollick asserts that this Court's comments about the use of the name "Bulldog" Yollick indicate a bias and prejudice against the Montgomery County courts and him. This Court sees no connection. Bankruptcy Local Rule 1001(f) requires certain formal etiquette as illustrated in Appendix A. Paragraph N of Appendix A states that all counsel should "Avoid disparaging remarks and acrimony toward counsel, and discourage ill-will between the litigants. Counsel must abstain from unnecessary references to opposing counsel, especially peculiarities." This Court believes that the use of the word "Bulldog" on pleadings works against the formal setting and professionalism that Paragraph N seeks to promote in the United States Bankruptcy Court for the Southern District of Texas. This Court is charged with enforcing the Bankruptcy Local Rules, and that is why the Court instructed Yollick to cease signing his pleadings as "Bulldog" Yollick. The spirit if not the letter of Bankruptcy Local Rule 1001(f) is that there is to be a certain level of formality in the Courtroom. That is why each male attorney who appears must wear a tie and jacket, must stand when addressing the Court, and must address the Court as "Your Honor." That is also why each attorney must address opposing counsel and all witnesses by their surname. And, that is also why attorneys should not be signing their pleadings using their nickname.

The Court's statement that it did not know "what the probate court and the folks up in that County decide you can" with respect to signing "Bulldog" on the pleadings in no way reflects bias or prejudice against Montgomery County courts in general and the Probate Court in particular. It

---

[5]Yollick apparently was not being candid with the Court when he made this representation. Specifically, he stated "Your Honor, if I may point out to the Court, actually, I stopped using that nickname, which I've had for quite awhile. And in my pleadings, probably in the last two months in this Court, it does not appear." [Transcript of February 24, 2005 Hearing, p. 32, lines 20 - 23]. Despite having made this representation to the Court, Yollick has in fact made filings since February 24 which he has signed over the typewritten name of Eric "Bulldog" Yollick. [*See e.g.* June 9, 2005 Notice of Reset of Meeting of Creditors in the Chapter 7 Case of William Franklin Bell, Case No. 05-37000; August 17, 2005 Notice of Reset of Meeting of Creditors in the Chapter 7 Case of Suzanne Marie Free, Case No. 05-41358; November 23, 2005 Notice of Reset of Meeting of Creditors in the Chapter 7 Case of Constance K. Nelson, Case No. 05-90909; and December 13, 2005 Notice of Reset of Meeting of Creditors in the Chapter 7 Case of Michael and Tammie Sutley, Case No. 05-91355]. True and correct copies of these filings are attached as **Exhibit G** to this Memorandum Opinion.

may well be that the Montgomery County courts have no local rule similar to Paragraph N of Appendix A and that it is acceptable to sign pleadings using nicknames such as "Bulldog." Federal courts and state courts differ in various ways, and this Court's comments were intended to suggest just that possibility. Yollick's complaint that the Court's comments reflect bias and prejudice is an eleventh hour stretch of imagination.

**Yollick Point No. 3:** "On April 21, 2005, in Adversary Proceeding Number 05-3198-H4-ADV, Judge Bohm ordered me to turn over certain property to Debtor after determining that property was part of Debtor's personal bankruptcy estate, even though Judge Bohm was aware that the Probate Court had, by a final order, ordered Debtor to turn over that same property to me as part of the Probate Estate."

**Analysis:** On April 7, 2005, the Debtor initiated the Turnover Proceeding against Yollick. The Debtor sought a TRO with respect to certain tangible assets in Yollick's possession. On April 8, a hearing was held on the Debtor's request for a TRO. This hearing was continued until April 21, 2005, at which time further testimony was adduced. The Court then made oral findings of fact and conclusions of law and granted the TRO. The Court did so after listening to extensive testimony from the Debtor and Yollick, after considering numerous exhibits introduced by both parties, and after listening to oral arguments of both the Debtor's counsel and Yollick's counsel. Certain of the Debtor's exhibits showed that assets being held by Yollick were titled in the Debtor's name. Because these particular assets were titled in Yollick's name, and because Yollick and his counsel, based upon the exhibits and testimony introduced, failed to persuade the Court, on rebuttal, that these assets did not belong to the Debtor, the Court ordered Yollick to turn over these assets pursuant to 11 U.S.C. § 542.

Now, approximately eight months later, Yollick contends that this Court's ruling reveals "the pervasive disregard that Judge Bohm has for the Montgomery County Probate Court and the Texas state court system." Yollick's major complaint is that the undersigned judge issued the TRO "even though Judge Bohm was aware that the Probate Court had, by a final order, ordered Debtor to turn over that same property to me as part of the Probate Estate." First, this Court was not aware that the Probate Court had, by a final order, required the Debtor to turn over the same property that was the subject of the TRO hearing.

Second, even if the Probate Court had issued such an order and this Court was made aware of it, this order fails to take into account the existence of this Chapter 13. Once a person files a bankruptcy petition, a bankruptcy estate is created. 11 U.S.C. § 541; *In re Affiliated Computers Sys.*, 52 F.3d 546, 550 (5th Cir. 1995); *In re Denton*, 169 B.R. 612, 613 (Bankr. W.D. Tex. 1994); *Munters Corp. v. Locher*, 936 S.W. 2d 494, 496 (Tex. App. - Houston [14th Dist.] 1997, writ denied); and 11 U.S.C. § 542 requires third parties in possession of property of the bankruptcy estate to turn over this property to the Trustee, *United States v. Whiting Pools, Inc.*, 462 U.S.A. 98, 205-06 (1983); *Georgia Pac. Corp.*, 712 F.2d 962, 966 (5th Cir. 1983). There is no question that assets titled in the Debtor's name constitute property of the Debtor's bankruptcy estate. At the TRO hearing, the Debtor proved that certain assets in Yollick's possession were titled in the Debtor's

name, and Yollick failed to prove that these assets were not in the Debtor's name and therefore not property of the estate. Accordingly, this Court's granting of the TRO was based upon a two day hearing and applicable bankruptcy law. For Yollick to now allege that the Court's ruling reveals a "pervasive disregard" of the Probate Court is completely without merit. Indeed, Yollick's entered into an Agreed Preliminary Injunction and Order for Turn Over of Property of the Estate eight days after this Court issued the TRO. Yollick could have gone forward with a temporary injunction hearing and adduced additional testimony and introduced additional exhibits to prove that the assets did not belong to the Debtor, *In re El Paso Refinery, L.P.*, 244 B.R. 613, 622 (Bankr. W.D. Tex. 2000) and therefore were not property of the estate. He chose not to take this course. His entering into the agreed order, a contract, estops him from now complaining months later about this Court's ruling. *In re Thornburg*, 277 B.R. 719, 726-27 (Bankr. E.D. Tex 2002) (citing *Continental, Boatman v. Sullivan*, 1990 WL 146699 (N.D. Ill. Oct. 1, 1990): *In re 360 Inns. Ltd.*, 76 B.R. 573, 578 (Bankr. N.D. Tex. 1987); *See In re Delaney's I, Inc.*, 1991 WL 337625, *2 (N.D. Ill); *See also In re Continental Airlines Corp.*, 907 F.2d 1500, 1508 n. 6 (5th Cir. 1990)).

Yollick also complains that this Court should not have held an emergency hearing on the Debtor's application for a TRO because once the TRO was issued, the Debtor simply left the assets subject to the TRO in Yollick's possession (paragraph 36). This Court is not clairvoyant: on April 21, 2005, when this Court issued the TRO, this Court did not know that the Debtor would subsequently leave the assets in Yollick's possession. The Court will not speculate why the Debtor has done so, but if Yollick believes that the Debtor has prosecuted the Turnover Proceeding to be vexatious, then Yollick should file the appropriate pleadings in this Court and seek the appropriate relief. He should not use subsequent events to characterize this Court's ruling of April 21, 2005, as "pervasive disregard" of the Probate Court.

**Yollick Point No. 4:** "On August 9, 2005, after one day's notice of the Court's *sua sponte* proceeding, the Court ordered me to post a bond in favor of the Bankruptcy Court for any attorney's fees paid from the Probate Estate to my attorneys for my litigation defense in this Adversary Proceeding. Judge Bohm was aware that the Probate Court had, by what is now a final order, ordered that I was authorized to pay for my attorney's fees for the litigation in this Adversary Proceeding by the Probate Court's July 11, 2005 Order Authorizing Dependent Administrator to Retain Bankruptcy Counsel and Pay Retainer. Judge Bohm's order, entered after no motion whatsoever and one day's notice, has effectively prevented me from paying my expenses of litigation in this Adversary Proceeding, while Debtor has spent hundreds of thousands of dollars in this litigation without first disclosing the source of such funds and the expenditures to the Bankruptcy Court in his Bankruptcy Proceeding. Judge Bohm's order would also appear to violate section 194 of the Texas Probate Code and deprives me of any effective representation. But for the kindness of Mr. Rech and Mr. Leonard Simon, who have not required immediate payment of their fees and expenses, I would be without any counsel in these proceedings."

**Analysis:** Yollick alleges that this Court's order of August 9, 2005 reveals "pervasive disregard" for the Probate Court. Yollick equates this Court's requiring him to post a bond in this bankruptcy for any attorney's fees paid from the Probate Estate to Yollick's attorneys for his defense

in the Adversary Proceeding as an attack on the Probate Court's order authorizing Yollick to use cash in the probate estate to pay his attorneys. This Court disagrees. This Court's August 9 order in no way contravenes the Probate Court's order. Yollick was, and still is, free to use cash from the Probate Estate to pay his attorneys. This Court issued the order requiring Yollick to post bond because the Probate Court had issued an order, which became final in April of 2005, setting forth that the Debtor is the sole distributee of the Probate Estate. Under these circumstances, any monies that Yollick uses to pay his attorneys for his defense in the Adversary Proceeding are monies that would otherwise go to the Debtor's estate. Because the Debtor is suing Yollick, not only in his capacity as dependent administrator but also in his individual capacity, if this Court issues a judgment in the Adversary Proceeding against Yollick, individually, then it would be inappropriate for the Probate Estate to pay Rech for defending Yollick, individually, against the counterclaims brought by the Debtor. Yollick is required to bear his own costs in defending himself. Yollick forgets that he did not have a bond in place until April of this year and that many of the acts about which the Debtor complains in his counterclaims occurred in 2002, 2003 and 2004. Thus, if this Court issues a judgment against Yollick on the counterclaims, the bonding company might well refuse to pay on the grounds that the bond was not in place, which could make it difficult for the Debtor to recover for any wrongdoing. By requiring Yollick to post a bond, this Court was protecting the Debtor's estate pending a decision from this Court in the Adversary Proceeding.

**Yollick Point No. 5:** "On that same day - April 7, 2005 - that Debtor filed a new Adversary Proceeding against me, Judge Bohm scheduled a hearing in the Proceeding for the next day, April 8, 2005. Judge Bohm ordered Debtor to notify all interested parties and to file a certificate of service with the Court. Debtor never filed a certificate of service.

"Judge Bohm conducted the April 8, 2005 hearing, despite the fact that Debtor had failed to file a certificate of service. The Court severely criticized me for my failure to attend the hearing on April 8 but never made any comment about Debtor's failure to comply with the Court's order to file a certificate of service regarding notice for that hearing. I was attending a previously-scheduled creditors meeting in Forth Worth, Texas on April 8, which such attendance was critical to the interests of two of my clients."

**Analysis:** Yollick 's attorney, Rech, appeared at the hearing on April 8, 2005, so he clearly received notice of the hearing. Nor did Rech complain that this Court had scheduled the TRO hearing to begin on April 8. In fact, Rech came to the hearing with several exhibits and adduced testimony from the Debtor on cross-examination. In this Court's view, Rech was well prepared. Hence, the Court can only draw one conclusion: the Debtor promptly notified Yollick and Rech on April 7 that there would be a hearing on April 8 on the Debtor's Application for a TRO. Yollick decided that he could not attend; Rech clearly did. In short, the Debtor complied with the substance of this Court's order. *See In re Charles George Land Reclamation Trust*, 30 B.R. 918, 921 (Bank. D. Mass. 1983) (noting 48 hour notice was reasonable); *In re Sheeran*, 38 B.R. 859, 860 (Bank. N.D. S.D. 1984) (holding 12 hours notice to creditors for expedited hearing sufficient to permit adequate preparation). *See also In re Steel Reclamation Res., Inc.*, 64 F.3d 670 (10th Cir. 1995) (holding notice need only be reasonably calculated to apprise interested parties of pendency of action). The

23

Debtor should have filed a Certificate of Service indicating that notice had been given. However, Rech never complained at the April 8 hearing, nor did either Rech or Yollick—both of whom attended the continuation of this hearing on April 21— complain about the Debtor's failure to file a Certificate of Service.  Indeed, on May 8, Yollick, through Rech, entered into an Agreed Preliminary Injunction with Order for Turnover of Property of the Estate. Yollick received due process and was capably represented on April 8 and April 21.[6]

**Yollick Point No. 6:** "Without taking any evidence and without any request by any party to this Adversary Proceeding, Judge Bohm scheduled a major show cause hearing on August 8, 2005, which he indicated he would hold the following day. Judge Bohm's show cause order was nothing short of a direct interference with the Texas Probate Court's proceeding and an assertion of federal subject matter jurisdiction where there simply is none."

"Judge Bohm conducted the August 9, 2005 hearing without taking any evidence.  Judge Bohm made his ruling during the August 9, 2005 hearing."

**Analysis:**  First, Yollick is incorrect that this Court issued a Show Cause Order. Rather, on August 8, 2005, this Court issued an Order Setting Status Hearing. There is a distinct difference between a show cause order and an order setting status hearing. The Court issues a show cause order when the Court perceives that there is some aspect about a case or proceeding that is improper. The purpose of the show cause order is to give notice that the Court has this concern and to give an opportunity to the parties named in the order to appear in Court and explain why the Court's concern is unfounded.  The Court issues a status hearing not because the Court has any concern that an impropriety might have occurred, but rather to discuss some aspect or issue about the case or proceeding that may need attention. For example, if this Court has abated an adversary proceeding, it might set a status hearing once every six months to determine whether the abatement should continue. The Court would set such a status conference in order to keep control of its docket and ensure that cases and adversary proceedings are closed when the circumstances so warrant.

On August 8, 2005, this Court issued its Order Setting Status Conference pursuant to 11 U.S.C. § 105(d)(1), which states, in pertinent part, that "The court, on its own motion . . . may . . . hold a status conference regarding any case or proceeding under this title after notice to the parties in interest."  Contrary to Yollick's suggestion that this Court has to take evidence and receive a request by a party to hold a hearing, this Court was well within its power to *sua sponte* schedule a status conference.

Second, 11 U.S.C. § 102(1)(A) states that the phrase "after notice and a hearing, or a similar phrase, means after such notice as is appropriate in the particular circumstances, and such

---

[6]The Court would note that the Court did not make a ruling at the close of the April 8 hearing (which Yollick did not attend). Rather, the Court continued the hearing until April 21. On this date, Yollick was able to appear and, in fact, gave testimony. The Court did not issue a ruling until after Yollick had testified and his counsel made closing arguments. Accordingly, Yollick received due process.

24

opportunity for a hearing as is appropriate in the particular circumstances." Yollick seems to complain that this Court's scheduling a status conference on 24 hours notice was inappropriate. Given the circumstances described in this Court's August 8 order, the Court believed that a status hearing needed to be held quickly. The Court was of this view because three events had just occurred which affected both the Adversary Proceeding in particular and the case in general. The Honorable United States District Judge Sim Lake had just denied Yollick's Motion for Withdrawal of Reference, which meant this Court would be the tribunal trying the lawsuit. Moreover, the parties had announced to this Court that they were contemplating mediation, which meant that this Court wanted to hear from the parties as to whether and when mediation would take place so that this Court could adjust its trial calendar accordingly. Finally, the Probate Court had authorized Yollick to use probate funds of at least $20,000.00 to pay Rech for defending Yollick in the Adversary Proceeding. In the wake of this ruling, this Court was concerned about the exposure of the Debtor's estate (which has been discussed in Response to Point No. 4 above) and wanted to review this issue with the parties. For all of these reasons, the Court believed it was important to quickly hold a status conference. *In re Messer*, 2005 WL 3273657 (Bankr. N. D. Fla.) (the Court *sua sponte* scheduled seven status conferences); *In re Frank Santara Equip. Corp.*, 227 B.R. 206, 208 (Bank. E.D. N.Y. 1998) (the court *sua sponte* scheduled a status conference).

Yollick complains that the Order Setting Status Hearing "was nothing short of a direct interference with the Texas Probate Court's proceeding and an assertion of federal subject matter jurisdiction where there simply is none." One of the issues addressed in this Order—Judge Lake's denial of Yollick's Motion for Withdrawal of Reference and the possibility of the parties mediating—was solely related to the Adversary Proceeding. A second issue addressed in the Order—the possibility of the parties mediating—certainly related to the Adversary Proceeding and might have also related to the probate proceedings to the extent that the parties could achieve a global settlement of all issues in dispute. The third issue—the Probate Court's order authorizing Yollick to pay Rech a retainer from Probate funds—certainly related to the probate proceedings, but it also affected the bankruptcy case due to the possible loss of funds that might otherwise wind up in the bankruptcy estate. As previously noted, this Court has already discussed the reasons why it decided at the August 9 hearing that Yollick would need to post a bond (see Response to Point No. 4). Yollick failed to appeal the order which this Court signed on August 16, 2005, and his complaining four months later calls into question Yollick's motive in filing the Motion to Disqualify.

Yollick also complains that this Court made its ruling on August 9 without hearing any evidence. This Court did not need to take evidence on this issue; there were no facts in dispute. However, if Yollick's attorney, Rech, had wanted to introduce evidence, he certainly could have requested to do so. *Gf., Sharp v. Kentucky*, 389 S.W.2d 317 (Ky. 1965) (holding that a petitioner who appeared in open court represented by counsel and elected to put on no evidence in support of the allegations was not denied due process when his motion was dismissed). Rech has not been shy about advocating on behalf of Yollick throughout this Adversary Proceeding; and if Rech had believed there was a need to introduce evidence on any issue, this Court has little doubt that Rech would have made such a request.

**Yollick Point No. 7:** "On August 25, 2005, Judge Bohm signed and entered an order threatening to impose sanctions on me if I failed to appear for my deposition."

"There was never a motion to compel, a motion for sanctions, or any other motion whatsoever where any party to this proceeding sought to compel my deposition or sanctions related to such deposition. I never filed a motion for protective order even seeking protection from such deposition. Instead, Judge Bohm simply entered an order relating to my attendance at the deposition and threatening me with sanctions without any notice of the consideration of such an order whatsoever."

**Analysis:** Yollick complains that the undersigned judge has violated his constitutional due rights by signing an order threatening to impose sanctions on him even though no motion to compel his deposition had been filed. This Court disagrees. The order this Court signed on August 25, 2005 was an order denying the Debtor's Motion to Quash Yollick's Notice of Intention to Take the Debtor's Deposition. The Order contained, *inter alia*, the following language: "Sanctions will be imposed if either Mr. Yollick or Mr. Sisco refuses to sit for a deposition or delays sitting for a deposition. Counsel for both parties shall make their best effort in coordinating their schedules for these depositions." The Court was not singling out Yollick; rather, the Court was sending a message to both Yollick and the Debtor, plus respective counsel, that gamesmanship in the discovery process would not be tolerated. Given the extreme acrimony between the Debtor and Yollick, the Court believed that it needed to send a strong message to both sides: the trial date was set, and discovery needed to be timely conducted without rancor and gamesmanship.

In addition, this Court has the power to control its docket. *In re Dansereau*, 274 B.R. 686, 689-90 (Bankr. W.D. Tex. 2002); *In re Cauthen*, 152 B.R. 149, 154 (Bankr. S.D. Tex 1993) and to ensure that parties timely complete discovery and minimize court time over discovery disputes. Fed. R. Civ. P. 37; Bankruptcy Rule 7037.The parties had already complained to this Court at the April 8 hearing about each other's failure to produce documents and to disclose information [Transcript of April 8, 2005 Hearing, page 43, line 3 through page 44, line 17; page 13, line 24 through page 15, line 15; page 64, line 1 through page 68, line 20], and this Court believed it was important on August 25, 2005 to ensure that the parties understood that they would need to sit for a deposition in the very near future given the scheduled trial date at that time. The Court was well within its power to issue the Order that it did, and no reasonable person would believe that this order reflects bias or prejudice against Yollick. Fed. R. Civ. P. 26(b)(2); 10 Collier on Bankruptcy ¶ 7026.03(b)(2) (15th ed. rev. 2005), *cf. Cavanaugh v. Saul*, 2005 WL 3591023, at *5 (D.D.C.) (finding the Court had broad discretion to enter orders limiting and managing discovery).

**Yollick Point No. 8:** "On November 22, 2005, at the conclusion of Debtor's case-in-chief during the trial of the Adversary Proceeding, I filed and presented a Motion for Judgment as a Matter of Law. The Court heard arguments on my Motion. At the conclusion of those arguments, and before Judge Bohm provided me with an opportunity to begin my case-in-chief, Judge Bohm stated that he would issue an order requiring me to show cause why I should not be sanctioned for my lack of candor at the February 24, 2005 hearing. My counsel, Steven R. Rech, requested that I be

permitted to respond through testimony before the Court would issue such a show cause order. Judge Bohm denied my counsel's request."

**Analysis:** Yollick is incorrect that the Court refused to allow him to put on his case-in-chief in defending against the counterclaims brought against him. After Sutter informed this Court that Sisco was through with his case-in-chief, Rech, rather than beginning his case-in-chief, made an oral motion for this Court to grant judgment as a matter of law; Rech noted that he had filed a written motion to this effect earlier in the day (Docket No. 258). The Court heard Rech's arguments, and then gave Sutter an opportunity to respond. Sutter did respond orally, but requested this Court to allow him time to file a written brief. Because Rech had filed a written motion earlier in the day, this Court believed that fairness dictated that Sutter should be given time to respond in writing. Accordingly, Yollick is therefore incorrect in stating that the undersigned judge did not provide him with an opportunity to begin his case-in-chief after Sisco rested. Rech chose to argue the motion for judgment as a matter of law, and Sutter requested time to respond in writing. The Court granted Sutter's request and continued the hearing until December 8, 2005.

Yollick is correct that at the November 22 hearing, this Court stated that it would issue a show cause order regarding Yollick's candor at the February 24 hearing, and that this hearing would be considered part of the Adversary Proceeding, as this Court was still assessing Yollick's credibility as a party. Yollick is also correct in stating that once this Court stated orally on the record that it had concerns about Yollick's candor and would therefore issue a show cause order, the Court would not allow Rech at that point to adduce testimony from Yollick on the subject of the show cause order. The Court believes that due process requires the Court to draft and issue the order, with a hearing scheduled in the future, so that the party and his counsel will have ample time to review the order and prepare for the hearing. Yollick's complaint therefore that this Court denied him due process when the Court refused to allow him to testify immediately after this Court's oral announcement from the bench is misplaced. Indeed, had this Court required Yollick to defend himself right then and there without this Court issuing a written order specifically describing the Court's concerns, then this Court would have been denying Yollick due process. By issuing a written show cause order and giving Yollick several days (until December 8, 2005) to review the order and prepare for the hearing, Yollick was able to reflect upon the issues identified in the order and then prepare to explain himself concerning these issues. Further, the Court would note that between the date that the Court orally announced that it would be issuing a show cause order and the date of the hearing on this order, Yollick retained counsel other than Rech to defend him; namely, Simon. Yollick also used the time to contact witnesses to appear on his behalf at the hearing, to gather together and collate exhibits to introduce at the hearing, to draft and file a Response to the Show Cause Order (Docket No. 271), and brief in support thereof (Docket No. 272), and to prepare himself for extensive testimony. The actions that he took during this two week period underscore the importance of providing due process: namely, to allow parties time to retain counsel, to review documents, to interview and obtain witnesses, to file pre-hearing briefs, and to prepare for the hearing. By providing a specific written order detailing this Court's concerns about Yollick, and by giving him ample time to prepare for the show cause hearing, this Court provided Yollick with the due process to which he is entitled.

Finally, this Court would note that at the beginning of the December 8 hearing, this Court asked Rech whether he wanted to put on his case-in-chief with respect to the counterclaims before the show cause hearing. Rech responded that he wanted the show cause hearing to go ahead of his case-in-chief because he was still undecided as to whether he wanted to put on a case-in-chief. Accordingly, this Court went forward with the show cause hearing. Yollick is incorrect to suggest that this Court prevented him from putting on his case-in-chief prior to holding the show cause hearing.

**Yollick Point No. 9:** "Later that day, on November 22, 2005, Judge Bohm issued the show cause order (the "November Show Cause Order")."

"The November Show Cause Order goes far beyond a typical show cause order. Rather, the November Show Cause Order contains fact findings made without affording me notice or an opportunity to be heard."

"Judge Bohm made a finding in the November Show Cause Order that 'Apparently, Mr. Yollick did not want to be candid with the Court.' Judge Bohm did not conduct a hearing before he made that finding."

**Analysis:** Yollick is correct that this Court issued a show cause order on November 22, 2005. This Court did so on the same day that the undersigned judge orally announced on the record that a show cause order would be issued. The Court wanted to ensure that the issues which concerned the Court about Yollick would be dealt with promptly in the wake of the Court's announcement.

The Court disagrees with Yollick that the show cause order "goes beyond a typical show cause order." There is no such thing as a typical show cause order. Show cause orders are issued whenever a court has concerns about issues and/or parties and/or attorneys for parties in a case or proceeding pending before the Court. The purpose of a show cause order is to convey the Court's concern about a matter or matters and to give an opportunity to those persons referenced in the order to address the Court about the concerns set forth in the order. Attached as **Exhibit H** are show cause orders from other cases of both the undersigned judge and other bankruptcy judges in the Southern District of Texas. A review of these orders demonstrates that there is no typical show cause order. What all of these orders do contain is (1) a detailed statement of the Court's concerns; and (2) a scheduled hearing for the persons mentioned in the order to address the issues.

Yollick is incorrect that the Court made a finding in the show cause order that Yollick did not want to be candid with the Court. The sentence about which he complains reads that "Apparently, Yollick did not want to be candid with the Court." (emphasis added). The Court expressly included the word "Apparently" in the sentence to emphasize the fact that the Court had concerns about Yollick's conduct but was providing Yollick an opportunity to explain himself. The order goes on to state that Yollick shall be entitled to adduce testimony and present evidence to this Court as to why he believed he was being candid. The very basis of the show cause order was to

28

alert Yollick of this Court's concerns about his conduct and to give him an opportunity at a hearing in the future to show this Court that his conduct was reasonable under the circumstances. It is only after this hearing that this Court is permitted to make findings of fact, and that is what this Court will do.

**Yollick Point No. 10:** "Judge Bohm found in the November Show Cause Order that 'Yollick knew that the Debtor would be seeking to confirm a Chapter 13 Plan, the confirmation of which would depend, in part, upon the plan's feasibility.' Remarkably, on the date to which Judge Bohm referred when I should have possessed that knowledge - February 24, 2005 - Debtor had not even filed a Chapter 13 Plan. Moreover, the Chapter 13 Trustee had to file a motion to dismiss the Debtor's Chapter 13 case for failure to file a Chapter 13 Plan. Ironically, when Debtor did file a proposed Chapter 13 Plan in mid-March, 2005, Debtor's plan did not depend in any manner whatsoever upon any distribution to Debtor from the Probate Estate, even though such a distribution was the subject of the November Show Cause Order. On February 24, 2005, Judge Bohm charged me with knowledge of Debtor's Chapter 13 Plan, which did not exist on February 24, 2005. The findings made in Judge Bohm's November Show Cause Order, which are clearly unfounded, erroneous, and made without any evidence or opportunity to be heard, have substantially harmed my reputation in the Montgomery County legal and business community and I have already lost a major client as a result."

**Analysis:** Yollick states that it is remarkable for this Court to expect him to know the Debtor would be seeking to confirm a Chapter 13 Plan when, on the date of the hearing (February 24, 2005), the Debtor had not yet filed a plan. The Court fails to see why Yollick would find it remarkable for the Court to expect him to know this information. Any attorney who is knowledgeable about consumer bankruptcy—and Yollick certainly appeared to be knowledgeable at that hearing given his exchange with this Court over the intricacies of 11 U.S.C. § 523—knows that the objective of an individual in a Chapter 13 case is to obtain a confirmed plan.[7]

---

[7]At the show cause hearing, Yollick testified that he is not knowledgeable about Chapter 13s. First, he has a duty to be knowledgeable about the fundamentals of a Chapter 13 if he is going to appear in court representing a creditor. *See In re Chapman*, 323 B.R. 470, 477-78 (Bankr. W.D. Wis. 2005). Second, it stretches credulity for Yollick to assert that he does not know that a fundamental goal, if not the fundamental goal, of a Chapter 13 is for the debtor to obtain a confirmed plan of reorganization. Indeed, at the hearing on December 16, 2005, Yollick, under cross examination but without prompting, responded to a question about the purpose of the February 24 hearing by stating that he viewed the dialogue as one concerning the adversary proceeding and not one concerning the "feasibility" of any plan that the Debtor might file. [Tape of December 16, 2005, 9:13:47- Day 2 of show cause hearing] The Court would note that anyone who claims he is not knowledgeable about Chapter 13s would not ordinarily used the term "feasibility." Yollick's own choice of words suggest that he is sufficiently well versed in Chapter 13s to know that a key objective is to propose a feasible plan so that it can be confirmed. Third, Yollick has appeared on behalf of creditors in previous Chapter 13s. *In re Sandy Earl Thompson*, Case No. 02-44988-H4-13; *In re Gregory Huckabay*, Case No. 04-38677-H5-13; *In re Ray Lee Huckabay*, Case No. 04-38679-H5-13; *In re Jeanne Lorriane Balasik*, Case No. 99-36718]. Fourth, Yollick has represented both debtors and creditors in many Chapter

On February 24, 2005, this Chapter 13 case had been in existence for seven days—having been converted from a Chapter 7 case—so it was not surprising that the Debtor had not yet filed a plan; the deadline had not yet passed. There could be no question, however, that the Debtor was required to file a proposed plan within 15 days of the date of conversion Bankruptcy Rule 3015(b); and there could be no question that this Court would focus on the feasibility of the plan in order to determine whether to confirm the plan. Hence, on February 24, 2005, this Court was assessing whether the Debtor would receive any funds in the near future from the Probate Estate which might be used to pay claims pursuant to whatever plan the Debtor filed. That is exactly why this Court asked Yollick at this hearing whether he would stipulate that the Debtor was the sole distributee of the Probate Estate. The Court was attempting to gain an appreciation of how much money might be available to pay claims in order to determine whether the Debtor's to-be-filed plan would be feasible and filed in good faith.

Yollick needs to remember that February 24, 2005 was the first hearing this Court ever held where Yollick made an appearance. This Court was attempting to learn as much as it could about the income sources of the Debtor so that it could make an informed decision in the future on whether to confirm whatever plan would be proposed by the Debtor. Yollick should not have been surprised, and should not have found it remarkable, that this Court would expect him to know that the Debtor would be filing a proposed plan. Nor should he have been surprised that this Court would ask questions about the Probate Estate as part of this Court's information gathering to make decisions about whether to confirm whatever plan the Debtor proposed. Indeed, as far back as March 5, 2004, the undersigned judge's predecessor, the Honorable Judge William Greendyke, was interested in learning whether the Debtor would be the sole recipient of assets from the Probate Estate.[8] The Court was fulfilling its duties to stay abreast of its case load so that it may issue rulings fairly and promptly. *See* 11 U.S.C. § 105(d)(1) (2005) (requiring that "[t]he court. . .shall hold such status conferences as are necessary to further the expeditious and economical resolution of the case"); *In re Refine Constr. Co.*, 175 B.R. 827, 831 (Bankr. E.D.N.Y. 1994) (stating "the public is entitled" to "proper, prompt, efficient, and effective case disposition [from its bankruptcy courts]").

---

7 cases; a list setting forth the names of the Debtors in these cases is attached as **Exhibit 1** to this Memorandum Opinion. While Chapter 7 is certainly distinct and different from Chapter 13, any attorney who has filed the amount of Chapter 7 cases that Yollick has cannot help but know something about Chapter 13 cases. After all, one basic question that any consumer bankruptcy attorney should ask a prospective client when he or she first meets with the attorney is whether that person would be better off in a Chapter 7 or a Chapter 13. This observation is true for cases filed prior to and after the Bankruptcy Abuse Prevention and Consumer Protection Act. Accordingly, this Court is skeptical when Yollick claims to be so ignorant about Chapter 13s.

[8]At the hearing on March 4, 2004, Judge Greendyke made the following statement: "Report back to me when you've got a decision from the State Court—up or down—about who owns the Estate—the Probate Estate. And, if indeed, the Debtor is the sole beneficiary—practically speaking—to actually release wise or whatever. There's no reason to try the law suit." [Transcript of March 5, 2004 Hearing, page 32, lines 7 - 11].

30

The Court's expectations of Yollick's knowledge about consumer bankruptcy cases show no bias or prejudice directed at Yollick. These expectations are reasonable given the fact that (a) Yollick himself initiated a complaint under 11 U.S.C. § 523 against the Debtor, and (b) Yollick carried on a very well versed dialogue with the Court at the beginning of the hearing on February 24 about the effect of a judgment that he might take against the Debtor once the Debtor had converted to a Chapter 13 case. [Transcript of February 24 Hearing, page 11, line 16 through page 13, line 3]. Although Yollick's testimony at the show cause hearing was that he is not well versed in Chapter 13 bankruptcy law, his performance at the February 24 hearing suggests otherwise.

Yollick next asserts that the Chapter 13 Trustee's filing of a motion to dismiss the Debtor's Chapter 13 case for failure to file a plan evidences this Court's bias and prejudice against Yollick. The Court disagrees. The Chapter 13 Trustee filed a Motion to Dismiss on March 9, 2005 (Docket No. 60), which was two weeks after the February 24 hearing. On February 24, the Court could not know the Debtor would not file his plan by March 9 and the Trustee would file a motion to dismiss for failure of the Debtor to file a plan. On February 24, when the Chapter 13 case was only seven days old, it was entirely reasonable for this Court to expect that the Debtor would timely file a plan; and therefore, it was reasonable for this Court to begin educating itself on what sources of income would be available to the Debtor to ensure that the plan would be feasible and filed in good faith. Therefore, the Court's inquiries of Yollick at the February 24 hearing, and the Court's concerns about Yollick's candor in his response as set forth in the show cause order, were reasonable. [9]

Yollick also states that it is ironic that when the Debtor did file his proposed plan, the plan did not depend in any manner upon any distribution to the Debtor from the Probate Estate. Apparently, Yollick believes that there is irony because of this Court's focus, from February 24 up to today, on whether the Debtor will be receiving any distribution from the Probate Estate. Yollick seems to believe that this Court should not be concerned about whether the Debtor will receive any distribution because the Debtor's own plan does not depend upon any distribution from the Probate Estate. However, because the Debtor's proposed plan does not depend upon a distribution from the Probate Estate does not mean this Court should disregard the Probate Estate. This Court has an independent duty to assess whether the Debtor's proposed plan is feasible and filed in good faith. *In re Chaffin*, 836 F.2d 215, 216 (5th Cir. 1988) ("The court has the authority and duty to examine a plan even when no creditor has objected. . ."); *In re Lapin*, 302 B.R. 184 , 186, n.1 (Bankr. S.D. Tex. 2003) ("The Debtor and Chapter 13 trustee objected to the standing of these parties. Since the

---

[9]In passing, the Court notes that the Chapter 13 Trustee was doing his job properly by filing the Motion to Dismiss (Case, Docket No. 60) on March 9 because a Chapter 13 debtor is supposed to file a proposed plan within 15 days of the date of the conversion of the Chapter 13 case. Bankruptcy Rule 3015(b); See also *In re East*, 172 B.R. 861, 864 n.3 (Bankr. S.D. Tex. 1994). The Court would also note in passing that the Debtor filed a proposed plan a few days later on March 15, 2005 (Docket No. 62). Whether the Debtor did so as a direct result of receiving the Trustee's Motion to Dismiss is unknown given the present state of the record. However, based upon this Court's experience as both a bankruptcy practitioner for twenty years and a judge for over one year, such a reaction is typical in Chapter 13 cases. In any event, the Debtor did file a proposed plan, and the Debtor's case has not been dismissed.

Court has an independent duty to evaluate plan confirmation requirements, the Court allowed these entities to present their case."). If this Court believes the Debtor will receive a distribution from the Probate Estate, this Court might conclude that the Debtor's proposed plan is not filed in good faith unless the plan is amended to use probate funds to pay claims; and that the plan can only be feasible if whatever funds are eventually distributed to the Debtor from the Probate Estate are used to pay claims in this Chapter 13 case. For these reasons, Yollick is incorrect in suggesting that the Court's focus on the Probate Estate and on Yollick's response about whether the Debtor is the sole distributee shows bias and prejudice against Texas state courts in general and Yollick in particular. The undersigned judge has a duty to enforce the Chapter 13 plan confirmation provisions, and can do so in this case only by knowing whether and when the Debtor will receive a distribution from the Probate Estate, and, if so, how much that distribution will be.

**Yollick Point No. 11:** "The November Show Cause Order leaves the impression that during the February 24, 2005, hearing, Judge Bohm did not know about my December 15, 2004 Motion for Summary Judgment in the Probate Court, when, in fact, the transcript of that hearing - Exhibit '2' - indicates that Debtor's counsel discussed that pleading at least twice."

**Analysis:** Yollick cites two places in the transcript of the February 24, 2005 hearing in an effort to show that this Court knew about Yollick's pending Motion For Summary Judgment in the Probate Court. The first cite is on page 23, line 24 through page 24, line 2. The Court has reviewed this portion of the Transcript (during which Sutter, not Yollick, was speaking), and there is no reference to Yollick's pending Motion for Summary Judgment.[10] The other cite that Yollick gives is on page 19, line 24 through page 20, line 6. Once again, it is Sutter, not Yollick, who is addressing the Court. Sutter states "[a]nd in the latest pleadings that have been filed by Mr. Yollick, one can see that all this is stating or conceding that point in the probate court, that the only person that's ever going to get money from this estate is Mr. Sisco." Sutter did not specifically refer to Yollick's pending Motion for Partial Summary Judgment, and therefore Yollick's insinuation that this Court knew of Yollick's Motion as of February 24 is incorrect. Sutter's representation led this Court to inquire of Yollick whether he or Yollick would stipulate that the Debtor is the sole beneficiary of the Probate Estate. Yollick responded unequivocally that he would not—leading this Court to conclude that contrary to the representation of Sutter that "the only person that's only going to get money from this estate is Sisco," there appeared to be other third parties with whom Sisco might have to share any distribution. If Yollick had informed this Court that he had already filed a Motion for Partial Summary Judgment in the Probate Court, which was supported by an affidavit signed by Yollick, alleging that the Chapter 7 Trustee (prior to the conversion from Chapter 7 to Chapter 13) was the sole distributee and that he was requesting the Probate Court to so hold, then this Court would have pressed Yollick right then and there as to why he would not stipulate that the Debtor (now that the case was in a Chapter 13) was the sole distributee.

---

[10]The lines cited by Yollick reads as follows: "been filed, and there's no doubt, we think, that they have finally admitted, after all of these years and being involved in this proceeding, that there aren't any other heirs - - or any other distributees, I should say."   [Transcript of February 24 Hearing, page 23, line 24 through page 24, line 2].

Yollick's unequivocal response was inconsistent with the allegations made in his pending Motion for Partial Summary Judgment, a pleading which this Court subsequently reviewed after the parties delivered this motion, together with other pleadings that have been filed with the Probate Court. Yollick's Motion for Partial Summary Judgment expressly represents to the Probate Court that "All four (4) of the other heirs of this estate had previously assigned all of their right, title and interest in this estate to *JON ALLEN SISCO*." Yollick's motion then concludes, correctly, that "All legal or equitable interests of the Debtor in property as of the commencement of the case become part of that bankruptcy estate, including any legal claims that belonged to the debtor before the petition was filed." Having made this statement, the motion then concludes as follows: "Therefore, all of the right, title and interest in this estate, after payment of administration expenses and after payment of probate estate creditors, should vest in Janet Casciato-Northrup, the Chapter 7 Trustee of the bankruptcy estate of JON ALLEN SISCO." The relief requested in the motion is that "the Court determine that Janet Casciato-Northrup is the sole remaining distributee of this estate after payment of administrative expenses and creditors of the estate, and that the Court grant such other and further relief to which ERIC YOLLICK, DEPENDENT ADMINISTRATOR OF THE ESTATE OF HERBERT CLINTON SISCO, may show himself to be justly entitled." The relief requested is inconsistent with Yollick's refusal to stipulate that the Debtor is the sole beneficiary of the Probate Estate.

Yollick's Motion for Partial Summary Judgment was filed on December 15, 2004—in other words, when the case was still a Chapter 7. Indeed, Yollick's motion requests that the Probate Court issue an order that the Chapter 7 Trustee (Janet Casciato-Northrup) be declared to be the sole remaining distributee. Once the case was converted to a Chapter 13—which meant that Ms. Casciato-Northrup would no longer have standing to be the distributee and that the Debtor would now have such standing—Yollick apparently changed his mind as to whether there was only one distributee. Yet, his Motion for Partial Summary Judgment was still a live pleading as of February 24, 2005. When Yollick stated that he would not stipulate that the Debtor was the sole beneficiary, he should have informed this Court about the allegations made in his Motion for Partial Summary Judgment—allegations which were sworn to by Yollick in an affidavit attached to the motion. Yollick needed to explain to this Court how he could reconcile his refusal to stipulate that the Debtor was not the sole beneficiary with his allegations in the motion that Ms. Casciato-Northrup was the sole distributee.[11] He failed to do so.

At the show cause hearing, Yollick testified that he did not believe there was a conflict between his refusal to stipulate and the allegations made in the motion. Yollick testified that this Court's question was whether he would stipulate that "there are no other heirs and that Mr. Sisco is

---

[11]This Court's use of the term "beneficiary" was the same term used by Judge Greendyke at the hearing on March 4, 2004. Specifically, Judge Greendyke's statement was as follows: "Report back to me when you've got a decision from the State Court—up or down—about who owns the Estate—the Probate Estate. And, if indeed, the Debtor is the sole beneficiary—practically speaking—to actually release wise or whatever. There's no reason to try the law suit." [Transcript of March 5, 2004 Hearing, page 32, lines 7 - 11].

the sole beneficiary as of today," whereas his Motion for Partial Summary Judgment requested a determination that the Chapter 7 Trustee was the "sole remaining distributee." In other words, in defending himself, Yollick's position is that there is a difference between "beneficiary" and "distributee." The problem with Yollick's position is two-fold. First, based upon the hearing that the undersigned judge's predecessor, the Honorable Judge William Greendyke, held on March 5, 2004, Yollick knew, or should have known, that this Court was focused on learning whether any distribution would be made from the Probate Estate to the Debtor's estate. His attempt to hide behind the technical difference between the word "beneficiary" and "distributee" is disingenuous. Second, at the show cause hearing, Yollick testified that even if the undersigned judge had asked him whether he would stipulate that Mr. Sisco was the sole distributee (as opposed to the sole beneficiary), Yollick still would have responded in the negative. [Tape of Hearing Held on December 21, 2005 at 10:30:33]. The Court fails to understand why Yollick would have so responded; but, in any event, the Court's questions about these issues do not reflect any bias or prejudice against Yollick or the Probate Court. This Court was attempting to understand the likelihood of the bankruptcy estate receiving monies from the Probate Estate, and this Court was well within its powers to explore these issues.

At the hearing on April 8, 2005, Rech, counsel for Yollick in the Adversary Proceeding, candidly conceded that Yollick should not have filed the Motion for Summary Judgment: "So your question—you know, it is not an easy thing to stand here and say Yollick was wrong when he filed that motion, but I do believe he was. And I apologize for it, Judge." [Transcript of April 8, 2005 Hearing, page 56, lines 20 - 23]. Moreover, at the same hearing, Rech stated that "I think Yollick was wrong and Yollick thinks Yollick is wrong and I'll show you why." [Transcript of April 8, 2005 Hearing, page 50, lines 6 - 7]. If Yollick thought that he was wrong in filing the motion, then he should have informed this Court at the February 24 hearing when he refused to stipulate that the Debtor was the sole distributee. If, on February 24, Yollick had not yet concluded that he was wrong in filing the motion, then he should have informed this Court of the allegations in the motion, and why he believed the allegations were true, and how they could be reconciled with his refusal to stipulate. Yollick did neither; he remained completely silent. But for this Court's questioning of Rech at the April 8 hearing, this Court wonders whether Yollick would ever have stepped up to the podium or filed a pleading informing this Court of his position on who the distributee or distributees are in the Probate Estate. Indeed, testimony at the show cause hearing and pleadings filed by Yollick suggest that Yollick continues to change his position on this issue despite the existence of a final order from the Probate Court determining that Sisco is the sole distributee.[12]

---

[12]As late as December 21, 2005, and despite the final order from the Probate Court dated April 25, 2005 holding that the Debtor is the sole distributee, Yollick gave testimony that he was not convinced that the Debtor was the sole distributee. Indeed, upon cross examination by Sutter, Yollick conceded that at the Montgomery County Hospital District Board Meeting held on December 13, 2005, Yollick told those persons in attendance that the Debtor claims he is the sole distributee—as opposed to telling them that Yollick is the distributee as set forth in the Probate Court's order. [Tape of Hearing Held on December 16, 2005 at 9:38:39].

All in all, this Court's questioning of Yollick and Rech about whether the Debtor is the sole distributee of the Probate Estate is no way indicative of bias or prejudice against Yollick or the Probate Court.

**Yollick Point No. 12**: "At the December 16, 2005, hearing, Judge Bohm permitted, over the objection of my counsel, the Court to gain awareness of my extrajudicial comments regarding the show cause proceeding and Judge Bohm's conduct. Judge Bohm permitted Debtor's counsel to examine me about comments which I made against Judge Bohm at a December 13, 2005, meeting of the Montgomery County Hospital District which a local newspaper carried in an article which Judge Bohm also admitted into evidence.

"Over my counsel's objection and after a query by me to Judge Bohm whether such testimony would be appropriate, Judge Bohm instructed me to answer a question which required me to disclose my feelings about Judge Bohm's misconduct and why Judge Bohm should disqualify himself. SUCH CONDUCT ALONE HAS COMPLETELY TAINTED THESE PROCEEDINGS AND WILL UNDOUBTEDLY RESULT IN JUDGE BOHM'S BIAS AGAINST ME. THERE IS NO WAY THAT I CAN GET A FAIR RULING FROM A JUDGE WHO HAS REQUIRED ME TO ADVISE HIM OF MY PERSONAL FEELING ABOUT HIS JUDICIAL DEMEANOR AND CONDUCT. JUDGE BOHM'S ACTIONS LEFT ME WITH NO OPTION OTHER THAN TO FILE THIS DISQUALIFICATION MOTION. SUCH CONDUCT ALONE WAS IMPROPER AND OFFENSIVE ENOUGH WITHOUT ANYTHING FURTHER TO JUSTIFY THE DISQUALIFICATION OF JUDGE BOHM. MY RIGHTS TO A FAIR AND IMPARTIAL TRIAL HAVE BEEN DESTROYED."

**Analysis:** The Court has listened to the tape of the hearing and read that portion of the hearing which has been transcribed. First, Yollick is incorrect in stating that his counsel objected to a question posed by Debtor's counsel about comments that Yollick made about the undersigned judge to the Board of the Montgomery County Hospital District. Indeed, not only did Yollick's counsel, Simon, not object; Simon requested the Court to allow Yollick to answer the question posed to him. Specifically, Simon stated the following: "Excuse me, your Honor. He's asked the witness a question. I think the witness should be entitled to answer the question." [Partial Transcript of December 16, 2005 Hearing, page 4, lines 15 - 17]. Hence, Yollick has waived his right to complain about this testimony. Fed. R. Evid. 103(a)(1); See e.g., *CP Interest, Inc. v. California Pools, Inc.*, 238 F.3d 690, 696-97 (5th Cir. 2001).

Second, even if Yollick's counsel had objected and this Court had overruled this objection, Yollick's testimony contained nothing that would provide a reasonable basis for prejudicing the undersigned judge against Yollick. Attached to this Memorandum Opinion as **Exhibit J** is a copy of the Transcript regarding the questions posed by Sutter to Yollick. Yollick's testimony was that he told the Board that the Debtor had "obviously found a favorable ear with the bankruptcy judge." [Partial Transcript of December 16 Hearing, page 4, lines 6 - 10]. Yollick's argument that this testimony will prejudice the undersigned judge against him is unreasonable. Saying that the Debtor

35

had obviously found a favorable ear seems to suggest that the Debtor—or, perhaps more accurately, the Debtor's counsel—has made an argument or presentation which has either caused this Court to issue a favorable ruling for the Debtor or might cause this Court to subsequently issue a favorable ruling. The comment does not imply that the undersigned judge is biased in favor of the Debtor or that the undersigned judge is unfair or corrupt in some way. The undersigned judge took no umbrage at the comment when Yollick gave his testimony; and even if it is construed to be critical of the undersigned judge, the comment simply does not rise to the level of causing a reasonable person to believe that the Court will now have a bias or prejudice against Yollick.

Yollick relies on *In re Olson* to support his contention that "[a] bankruptcy judge should recuse himself when he is aware of accusations of improper conduct outside of the Courtroom, even if those accusations were made solely to support disqualification." Yollick's Motion to Disqualify at page 18 (citing *In re Olson*, 20 B.R. 206, 210 (D. Neb. 1982)). This reliance is misplaced. In fact, *Olson* does not stand for this proposition. There, the Court merely stated in dicta in a footnote that if the Debtor made false accusations against the judge solely to support a future disqualification motion, that would not necessarily be a basis for the judge to deny the motion; an "average man on the street" might doubt a judge's ability to be impartial in light of such accusations. *In re Olson*, 20 B.R. at 210 n.8.

In addition, the *Olson* case has received criticism from other bankruptcy courts.

"Some courts have resolved the issue of disqualification by determining that *appearances* are most important, regardless of facts. *See In re Olson*, 20 B.R. 206 (D. Neb. 1982), where the district court reversed the bankruptcy court and required recusal because the judge was aware the debtor had made accusations of improper conduct against him to various government officials. However, the Fifth Circuit case on which *Olson* relied was grounded on more compelling and persuasive facts. *See id.* at 21 (citing *Potashnick v. Port City Const. Co.*, 609 F.2d 1101, 1111 (5th Cir.), *cert. denied*, 449 U.S. 820, 101 S. Ct. 78, 66 L. Ed. 2d 22 (1980) (father of trial judge was partner in law firm representing a party in the case, and attorney for the plaintiff also represented judge in unrelated manner; "questionable case" calling for disqualification)). *Olson* is not the view of the First Circuit and may, in fact, be an aberration.

*In re Whet*, 33 B.R. 424, 426-27 (Bankr. D. Mass. 1983).

Finally, *Olson* is distinct from the case at hand. In *Olson*, the debtor and his employee made accusations of improper conduct against the judge to government officials, accused the judge of conspiracy to set fees with a lender, and alleged that the judge had extrajudicial knowledge of these accusations transmitted through the Trustee and the judge's law clerk. *In re Olson*, 20 B.R. at 207. The present case differs from *Olson* in at least two respects. First, Yollick's comment that the Debtor has found a favorable ear with the undersigned judge is much less severe then the Debtor's accusation of conspiracy and reporting of the judge's alleged misconduct to government authorities

in *Olson*. Second, the *Olson* facts support the possibility of extrajudicial knowledge; whereas, in the instant case, the undersigned judge's knowledge is derived from his participation in this proceeding. For all these reasons, this Court finds that a reasonable person having knowledge of the relevant facts would conclude that the undersigned judge's impartiality could not be questioned based upon Yollick's testimony concerning his feelings about the undersigned judge.

**Yollick Point No. 13:** "Both my probate attorney Patrick Green and I filed $0.00 proof of claim in the main Bankruptcy case in order to indicate that neither of us were making any claim against the Debtor in our individual capacities in response to Debtor's Schedules which included alleged debts to me and Patrick Green for 'attorney's fees' in Debtor's Schedules."

"Debtor has admitted before Judge Bohm that he does not know why he included those debts on his Schedules and that he has never owed me or Patrick Green attorney's fees."

"The proof of claim forms used by Patrick Green and me were essentially identical with one difference, which Judge Bohm has attempted to turn into a substantive distinction for jurisdictional purposes. On my $0.00 proof of claim form, I showed that the date the debt incurred was 'N/A.' See Exhibit '12' which is a true and correct copy of my proof of claim form. On Patrick Green's $0.00 proof of claim form, Patrick Green showed that the date debt incurred was 'Never.'"

"On November 15, 2005, Judge Bohm distinguished the two proof of claim forms as a result of the difference between my showing 'N/A' as the date of the debt was incurred and Patrick Green showing "Never" for such date. I filed my $0.00 proof of claim form, which was tantamount to a withdrawal of a claim, more than twenty-one (21) months before the Adversary Proceeding went to trial and before Judge Bohm ruled on the withdrawal. Somehow, Judge Bohm has determined that I was seeking attorney's fees from Debtor, whereas Patrick Green was not, despite the fact that I never amended the proof of claim form and the bar date for filing claims has elapsed."

"Judge Bohm has stated on two occasions - June 29 and November 15, 2005 - that his distinction between my and Patrick Green's proof of claim form was the basis for Judge Bohm's decision not to grant leave for Debtor to sue Patrick Green in the Bankruptcy Court. Judge Bohm denied my Rule 13 motion to dismiss on the basis of the distinction between 'N/A' and 'Never.' Judge Bohm denied me a right to a jury trial (as guaranteed under the Seventh Amendment to the Constitution of the United States) on the basis that there is a distinction between 'N/A' and 'Never' and on the basis that, as a result of that alleged distinction, I submitted myself to the Bankruptcy Court and waived a right to a jury trial for all purposes. Such ruling is not only arbitrary and capricious but also shows Judge Bohm's prejudice and bias against me in these proceedings.

**Analysis:** Yollick complains vociferously that the Court's rulings relating to Yollick's proof of claim reflect bias and prejudice by the undersigned judge. Specifically, Yollick complains that this Court's drawing distinctions between his proof of claim and Patrick Green's proof of claim have led this Court to wrongfully hold that (1) the Debtor has standing to sue Yollick; (2) Yollick has no right to a jury trial on the counterclaims lodged against him by the Debtor; and (3) Yollick's motion

to dismiss the Debtor's counter-claims against Yollick should be denied.

A party may not base a motion to disqualify a judge on the grounds that orders signed by the judge constitute bias. *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966). That is exactly what Yollick is doing here. On March 14, 2005, this Court signed an order granting the Debtor leave to bring counterclaims against Yollick (Docket No. 32). Yollick sought leave from the United States District Court to appeal this Court's March 14 order. On June 9, 2004, the Honorable Sim Lake denied Yollick's motion for leave to appeal and wrote a Memorandum Opinion setting forth his reasons. On March 23, 2005, Yollick filed his Jury Demand (Docket No. 43) and Motion for Withdrawal of Reference (Docket No. 44). On July 22, 2005, this Court filed with the United States District Court for the Southern District of Texas a Report and Recommendation Regarding Yollick's Motion for Withdrawal of Reference. This Court recommended that the District Court deny the Motion for Withdrawal of Reference. On August 3, 2005, the Honorable Sim Lake denied Yollick's Motion for Withdrawal of Reference (Docket No. 132). On August 26, 2005, this Court signed an Order Denying Yollick's Jury Demand (Docket No. 156). Finally, on November 15, this Court signed an Order Denying Yollick's Motion to Dismiss the Counterclaims for Lack of Subject Matter Jurisdiction (Docket No. 252).

Yollick may not have been pleased with these orders, but he had the opportunity to lodge arguments regarding these orders; he briefed the issues; both District Judge Lake and the undersigned judge issued rulings; the rulings were reduced to written orders; and the written orders were docketed. For Yollick to now say that these orders reflect this Court's bias and prejudice against him flies in the face of ample case law regarding the inability of a party to base a motion to disqualify on previous orders signed by the Court. *See e.g., United States v. Grinnell Corp.*, 384 U.S. at 583.[13] Even worse, in this case, Yollick filed his Motion to Disqualify after a trial in the Adversary Proceeding that required several days to complete. Hence, not only is Yollick basing the Motion to Disqualify on improper grounds; the timing of his filing this motion is very suspicious.

**Point No. 14:** "Much of the information upon which I have based this Affidavit I have only discovered in the last five weeks. Some of the critical facts - the transcript of the March 14, 2005 hearing - I have discovered in the past four (4) days. Obviously, the problems which occurred at the December 16, 2005, hearing occurred in the past three (3) days."

**Analysis:** Yollick is substantially off the mark in saying that much of the information upon which he bases the Motion to Disqualify was discovered "in the last five weeks" (i.e. for the five week period prior to December 19, 2005, which was the date that the Motion to Disqualify was filed.)

---

[13]The Court would note that Yollick did not file a motion for reconsideration of any of these orders. Further, the Court would note that Yollick also failed to certify, under 28 U.S.C. § 1292(b), an interlocutory appeal of District Judge Lake's order denying Yollick's motion for withdrawal of reference. *See In re Enron Corp.*, No. 03 CIV. 1727, 2003 U.S. Dist. Lexis 19543, at *2 (S.D.N.Y.); *In re Vicars Ins. Agency, Inc.*, 96 F. 3d 949, 951 (7th Cir. 1996).

First, Yollick complains that this Court's comments on February 24, 2005 about Yollick's use of the moniker "Bulldog" reflects bias and prejudice of this Court towards Yollick and the Probate Court. Yet, Yollick has waited 10 months to raise the issue.

Second, Yollick complains that this Court improperly held a hearing on March 14, 2005, conducted *ex parte* communications with the Debtor's counsel, and signed orders which show bias and prejudice towards the Probate Court.[14] Yet, Yollick made no mention of his concerns until December 19, 2005. Yollick claims that he had great difficulty in obtaining the transcript of the March 14, 2005 hearing, which has led him to conclude that this Court conducted *ex parte* communications with the Debtor's counsel.[15] The Court doubts that Yollick had the difficulty that he claims, but assuming that he had as much difficulty as he asserts, he still knew as far back as March 14, 2005 that this Court had signed the four orders on that day which he now claims show bias and prejudice towards the Probate Court. [Yollick's Motion to Disqualify at pages 15 - 15; 21]. Yet, he filed no motions to disqualify the undersigned judge for 9 months after the Court signed these orders, and he did so only after a multi-day trial had occurred.

Third, Yollick complains that this Court's failure to criticize the Debtor for failing to file a certificate of service regarding the April 8, 2005 hearing constitutes bias and prejudice against Yollick. Yet, Yollick failed to raise this issue for 8 months.

Fourth, Yollick complains that this Court's comments on April 8, 2005 about the Probate Court not moving very quickly reflects bias and prejudice. Yet, Yollick waited 8 months to raise this issue.

Fifth, Yollick also complains that this Court's oral finding of fact on April 21, 2005 that he was an "uninsured independent administrator" reflects bias and prejudice against the Probate Court.

---

[14]The Court signed four orders on March 14, 2005, which were all referenced on the record at the March 14 hearing. These orders are entered on the Docket Nos. 30, 31, 32, and 33. Specifically, these orders are as follows:

| Docket No. 30 - | Order Granting Application to Employ Special Trial Counsel: J. Douglas Sutter and the Firm of Kelly, Sutter & Kendrick, PC; |
| Docket No. 31 - | Amended Comprehensive Scheduling Order Signed on 3/14/2005; |
| Docket No. 32 | Order Granting Leave to file Debtor's Counterclaim; and Extend Scheduling Order Dates/Deadlines and to Continue Trial; and |
| Docket No. 33 - | Order Granting Motion to Extend Submission Date of Counterclaim and Extend Scheduling Order Deadlines. |

[15]Yollick makes this claim regarding the transcript in paragraph 17 of the Motion to Disqualify. See footnote 3 for the Court's comments about Yollick's complaint in obtaining the transcript.

Yet, Yollick waited 8 months to raise this issue despite having been given ample opportunity to seek a modification of this finding of fact and despite having entered into an agreed preliminary injunction on May 5, 2005 after the TRO was issued on April 21, 2005.

Sixth, Yollick complains that this Court's temporary restraining order of April 21, 2004 reflected this Court's bias and prejudice towards Yollick and the Probate Court. Yet, Yollick, who entered into an agreed preliminary injunction 14 days after the issuance of the TRO, has waited 8 months to assert bias and prejudice in issuing the TRO.

Seventh, Yollick complains that this Court's issuance on August 8, 2005 of an order setting status hearing reflects bias and prejudice against Yollick. Yet, Yollick failed to raise this issue until 4 months later.

Eighth, Yollick complains that this Court's order of August 9, 2005 requiring him to post a bond shows bias and prejudice towards Yollick and the Probate Court. Yet, Yollick has waited 4 months to raise this issue.

Ninth, Yollick complains that this Court's order of August 25, 2005 requiring Yollick (and the Debtor) to timely sit for a deposition if so requested exhibits bias and prejudice against Yollick. Yet, Yollick only raised this issue for the first time 4 months later.

A party seeking to disqualify a judge must make a timely motion. *United States v. Vander*, 160 F.3d 263, 264 (5th Cir. 1998); *United States v. Anderson*, 160 F.3d 231, 234 (5th Cir. 1998); *Hollywood Fantasy Corp. v. Gabor*, 151 F.3d 203, 216 (5th Cir. 1998). A motion to disqualify is considered timely if it is filed "at the earliest moment after knowledge of the facts demonstrating the basis for such disqualification." *Travelers Ins. Co. v. Liljeberg Entrs., Inc.*, 38 F.3d 1404, 1410 (5th Cir. 1994); *Id.* By failing to timely move for recusal, a party waives its objection. *Id.*; *Health Servs. Acquisition Corp. v. Liljeberg*, 796 F.2d 796, 802 (5th Cir. 1986) *aff'd*, 486 U.S. 847 (1988).

The paragraphs above reflect that much of the information upon which Yollick bases the Motion to Disqualify was acquired many months prior to the filing of the Motion to Disqualify. Yollick's representation that he only discovered much of the information "in the last five weeks" is simply wrong. A motion for disqualification must be made "at the earliest possible moment" after obtaining information of the possible bias. *United States v. Yonkers Bd. of Educ.*, 946 F.2d 180, 183 (2nd Cir. 1991); *Apple v. Jewish Hosp. & Medical Ctr.*, 829 F.2d 326, 333 (2nd Cir. 1987); *Polizzi v. United States*, 926 F.2d 1311, 1321 (2nd Cir. 1991); *SEC v. Grossman*, 887 F. Supp. 649 (S.D. N.Y. 1995). The fact that Yollick had all of this information for several months leads this Court to conclude that the Motion to Disqualify is untimely filed. *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 869 (1988) (a delay of 10 months is untimely); *Singer v. Wadman*, 745 F.2d 606, 608 (10th Cir. 1984) (a delay of one year is untimely); *In re United States v. Barrett*, 111 F.3d 947, 951 (D.C. Cir. 1997); *First Interstate Bank of Arizona vs. Murphy, Weir & Butler*, 210 F.3d 983, 988, fn. 8 (9th Cr. 2000); *Anwiler*, 958 F.2d 925, 930 (9th Cir. 1992): *United States v. Rogers* , 119 F.3d 1377, 1380 (9th Cir. 1997); *In re Preston v. United States*, 923 f.2d 731, 733 (9th Cir.

1991); and *United States v. Bayless*, 201 F.3d 116, 127 (2nd Cir. 2000). Indeed, the fact that he filed the Motion after a 7 day trial underscores how untimely the Motion really is. *United States v. Conforte*, 624 F.2d 869, 879 (9th Cir. 1980); *United States v. Poll*, 748 F. Supp. 86, 88-89 (S.D. N.Y. 1990), aff'd, 932 F.2d 956 (2nd Cir. 1991) (recusal motion made after or during a trial will almost be held untimely where the ground for disqualification was known at or before trial).

In footnote 9 at page 21 of his Motion to Disqualify, Yollick argues that there are no time limits within which disqualification must be sought. Yollick relies on *Potashnik* and *Roberts* to support this proposition. *Potashnick v. Port City Constr. Co.*, 609 F. 2d 1101, 1115 (5th Cir. 1980); *Roberts v. Bailor*, 625 F. 2d 125, 128 n. 8 (6th Cir. 1980). Both of these opinions were published in 1980. Since that time, the Fifth Circuit has repeatedly held that a motion to disqualify under § 455 must be filed timely, lest it be waived. *See, e.g., United States v. Vander*, 160 F. 3d at 264; *United States v. Anderson*, 160 F. 3d at 234; *Hollywood Fantasy Corp. v. Gabor*, 151 F. 3d at 216.

Even if the Motion to Disqualify could somehow be construed as timely filed, the Motion must be denied because it is without merit. As discussed throughout this Memorandum Opinion above, the actions taken by this Court do not reflect any bias or prejudice of this Court towards Yollick or the Probate Court. Yollick has the burden of proof, which is substantial, and must overcome a presumption of impartiality. *Njie v. Lubbock County, Texas*, 999 F. Supp. at 860. He has woefully failed to meet his burden of proof.

### D. This Court has issued some favorable rulings for Yollick, and these rulings reflect that this Court has no bias or prejudice against Yollick or the Montgomery County courts.

It is also worth noting that this Court has issued several rulings in Yollick's favor. A reasonable person would conclude that these rulings reflect that this Court has no bias or prejudice against Yollick. Set forth below is a list of the orders that this Court has signed ruling in Yollick's favor, plus a description of the relief granted:

(1) Order dated March 14, 2005 entitled "Order Granting Motion for Extension of Submission Date on Debtor's Motion for Leave to File Counter-Claim and on Other Scheduling Order Deadlines (Docket No. 33)—On February 14, 2005, Yollick filed a Motion to Extend Time of Submission Date on Debtor's Motion for Leave to File Counter-Claim and on Other Scheduling Order Deadlines (Adversary Proceeding No. 04-3252, Docket No. 19). The Court granted this Motion.

(2) Order dated April 6, 2005 entitled "Order"(Docket No. 61)—On April 5, 2005, Yollick filed a Motion to Withdrawal (sic) Eric Yollick, Dependent Administrator of the Estate of Herbert Clinton Sisco's Motion to Quash Debtor's Amended Notices of Intention to Take Oral Deposition of Eric Yollick and Subpoena Duces Tecum and Request for Emergency Hearing (Adversary No. 04-3252, Docket No. 58). The Court granted this Motion.

41

(3)     Oral Ruling from the bench on April 8, 2005 (Adversary Proceeding No. 05-03198)—This Court ordered the Debtor to turn over his personal tax returns and the tax returns of Conroe Construction Company to Yollick and his counsel. [Transcript of April 8, 2005 Hearing, page 64, line 5 through page 67, line 10].

(4)     Order dated July 8, 2005 entitled "Order Denying Debtor's Emergency Motion for Status Conference and to Approve Procedure for Review and Final Allowance of Attorney Fee Claims Against the Estate of Sisco" (Case, Docket No. 98)—The Debtor requested this Court, among other things, to establish a procedure whereby all claims for attorney's fees relating to services performed concerning the Probate Estate. The Debtor also requested the Court to adjudicate these claims. Yollick vigorously opposed this motion. The Court denied the motion.

(5)     Order dated July 8, 2005 entitled "Order Denying Debtor's Emergency Motion to Reconsider and Vacate Order Lifting Stay" (Case, Docket No. 97)—The Debtor requested the Court to reimpose the Automatic Stay that this Court (the Honorable William R. Greendyke) had lifted on March 5, 2004 to allow proceedings to go forward in the Probate Estate. Yollick vigorously opposed this motion. The Court denied the motion.

(6)     Order dated August 25, 2005 entitled "Order"(Docket No. 155)—The Debtor filed a Motion to Quash Yollick's Notice of Intention to Take Deposition of Jon A. Sisco. This Court denied the motion. In the Motion to Disqualify, Yollick complains about this Order because this Court included language in the order that both and Yollick and Sisco would be sanctioned if they refused to sit for a deposition. The Court inserted this language to make it clear to both parties that they needed to realize that both of them would have to submit to a deposition and that they could not play gamesmanship by arguing over who would be deposed first (which is the argument the Debtor was making in the Motion to Quash). Yollick complains that this language reflects the Court's bias and prejudice against him. This Court disagrees: the Court was attempting to ensure that discovery be conducted properly, promptly, and without gamesmanship. Moreover, this Court denied the Debtor's motion, and Yollick thereafter was able to depose the Debtor.

(7)     Order dated November 16, 2005 entitled "Order" (Docket No. 253)—The Debtor objected to a subpoena that Yollick served on Judicial Watch, Inc. wherein Yollick requested copies of all letters between the Debtor's attorneys and Judicial Watch, Inc. concerning the Herbert Clinton Sisco estate or any litigation relating thereto. Yollick argued that the objection should be overruled and that this Court should require Judicial Watch, Inc. to immediately produce all such documents. This Court overruled the Debtor's objection and ordered that the documents be produced (and they were in fact produced as requested by Yollick's counsel).

(8)     Oral ruling from the bench on November 16, 2005 (Adversary Proceeding No. 04-3252)—This Court granted in part Yollick's Motion for Summary Judgment. Specifically, this Court held that the principle of collateral estoppel would apply with respect to the annual accountings that Yollick has filed with, and have been approved by, the Probate Court.

## E.     A judge's duty to investigate questionable conduct cannot be equated with a basis to disqualify.

Yollick complains that the findings contained in the Court's November 22, 2005 Show Cause Order "have substantially harmed my reputation in the Montgomery County legal and business community and I have already lost a major client as a result." Yollick relies on a quotation by Judge Schwarzer included in the Fifth Circuit's *Thomas* opinion to support his argument that the undersigned judge inappropriately commented on Yollick's lack of candor and thereby improperly compromised Yollick's legal reputation and career. Yollick quotes as follows:

> Judges are prone to forget the sting of public criticism delivered from the bench. Such criticism, while potentially constructive, can also damage a lawyer's reputation and career. The judge should take care, therefore, that what is said is commensurate with the violation. There is a distinction between bad practice and lack of integrity. Being guilty of the former does not invariably justify a charge of the latter. *Thomas v. Capital Sec. Serv., Inc.*, 836 F.2d 866, 877 (5th Cir. 1988) (quoting Judge Schwarzer).

Notably, Yollick omits the remainder of the quotation, which continues as follows:

> At the same time, enforcing Rule 11 is the judge's duty, albeit unpleasant. A judge would do a disservice by shying away from criticism or reproval where called for. *Id*.

When viewed in its entirety, this authority does not stand for the proposition that a judge should not criticize attorneys; rather, it instructs judges to administer criticism judiciously when warranted. In the case at bar, the show cause order's language describing the dialogue between Yollick and this Court at the February 24 hearing is arguably not criticism, but an expression of concern. However, to the extent that it constitutes criticism, such criticism was light and merited under the circumstances.

## IV. CONCLUSION

It is well-settled that a judge has 'an affirmative duty. . . not to disqualify himself unnecessarily." *Nat'l Autobrokers Corp. v. General Motors Corp.*, 572 F.2d 953, 958 (2nd Cir. 1978). Indeed, "[A] judge has as much of a duty not to recuse himself absent a factual basis for doing so as he does to step aside when recusal is warranted." *Id*. Under the circumstances in this case

and in this Adversary Proceeding, as described throughout this Memorandum Opinion, the undersigned judge believes, and so finds, that he is not bias and prejudice against Yollick or any Court in Montgomery County, Texas. Accordingly, the undersigned judge believes, and so finds, that he has an affirmative duty not to recuse himself.

"Section 455 does not entitle litigants to judges of their own choice." *In re Betts*, 143 B.R. 1016, 1022 (N.D. Ill. 1992) (citing *Blizard v. Fielding*, 454 F. Supp. 318 (D. Mass. 1978), aff'd, 601 F.2d 1217 (1st Cir. 1979)). Yollick waited months to file the Motion to Disqualify, and by the time he filed this Motion, several days of testimony from multiple witnesses had already been adduced and over two hundred exhibits had already been introduced in the Adversary Proceeding. His Motion to Disqualify is nothing more than an effort to intimidate the undersigned judge to step aside because Yollick is worried about how he fared at trial and what this Court's ruling will be. Under these circumstances, no reasonable person would believe the undersigned judge is biased or prejudiced against Yollick. Rather, a reasonable person would believe that the Motion to Disqualify is an attempt to disqualify the undersigned judge with the goal of obtaining another jurist to adjudicate the Adversary Proceeding, and other disputes, and issue rulings that Yollick believes will be more favorable to him than the rulings that he believes the undersigned judge will issue. Yollick's attempt to obtain a second bite at the apple will not work. The undersigned judge has a duty to stay on board and finish the job that he has been appointed to do. The undersigned judge will do exactly that.

For all of the reasons set forth above, Yollick's Motion to Disqualify will be denied in a separate order to be entered on the docket simultaneously with the entry of this Memorandum Opinion.

Signed this 2nd day of February, 2006.

Jeff Bohm
U.S. Bankruptcy Judge

44

# Exhibits
# Available Via PACER